STATE OF CALIFORNIA, Plaintiff,

v.

Bob BERGLAND, in his official capacity as Secretary of U. S. Department of Agriculture; R. Max Peterson in his official capacity as Chief of Forest Service of the U. S. Department of Agriculture; Zane G. Smith, Jr., in his official capacity as Regional Forester of the California Region of the Forest Service of the U. S. Department of Agriculture, Defendants.

County of Trinity, Natural Resources Defense Council, Clear Creek Legal Defense Fund, Animal Protection Institute of America, Siskiyou Mountain Resources Council, South Fork Trinity Watershed Assn., Trinity Alps Group, Christine Jenican, Greg Kroll, William Boyer, Monica Starr, Mendocino Citizens for Wilderness, Mt. Shasta Citizens Resources Council, Plaintiffs/Intervenors.

County of Del Norte, County of Siskiyou, County of Shasta, National Forest Products Assn., Western Timber Assn., American Plywood Assn., Federal Timber Purchasers Assn., Industrial Forestry Assn., Southern Forest Products Corp., Western Wood Products Assn., Bendix Forest Products Assn., Champion International Corp., Hi-Ridge Lumber Co., Louisiana Pacific Corp., Paul Bunyon Lumber Co., Sierra Forest Products, Southwest Forest Industries, Inc., Simpson Timber Co., Inland Forest Resources Council, Webco Lumber Inc., Harwood Products, Harwood Investment Co., Eugene F. Burrill Lumber Co., McGrew Bros. Sawmill Inc., Mountain Fir Lumber Co., Rough & Ready Lumber Co., Rough & Ready Timber Co., Defendants/Intervenors.

No. S–79–523.

United States District Court, E. D. California.

Jan. 8, 1980.

Ronald Barbatoe, Dist. Atty., County of Trinity, Weaverville, Cal., for Trinity County.

Robin L. Rivett, Pacific Legal Foundation, Sacramento, Cal., for Shasta, Siskiyou, and Del Norte Counties.

E. Robert Wright, Deputy Atty. Gen., Sacramento, Cal., for State of California.

Gary W. Wilburn, Lands Div., General Litigation Section, Dept. of Justice, Washington, D. C., Francis M. Goldsberry, II, Asst. U. S. Atty., Sacramento, Cal., for U. S. defendants.

David Booth Beers, Shea & Gardner, Washington, D. C., for National Forest Products Assn. et al.

George A. Sears, Pillsbury, Madison & Sutro, San Francisco, Cal., for National Forest Products Assn.

John D. Aldock, William R. Galeota, Shea & Gardner, Washington, D. C., for amicus National Ass'n of Homebuilders et al.

Roger Beers, New York City, Trent W. Orr, San Francisco, Cal., for Natural Resources Defense Fund.

Gerald Grinstein, Seattle, Wash., Tovah Thorslund, Washington, D. C., Preston, Thorgrimson, Ellis, Holman & Fletcher, Seattle, Wash., Jared G. Carter, Thomas S. Brigham, Rawles, Hinkle, Finnegan, Carter & Brigham, Ukiah, Cal., for Webco Lumber et al.

Francia M. Welker, Fort Bragg, Cal., for Clear Creek Legal Defense Fund et al.

A. James Robertson, II, Howard, Prim, Rice, Nemerovski, Canady & Pollak, San Francisco, Cal., for amicus National Ass'n of Homebuilders.

## OPINION AND ORDER

KARLTON, District Judge.

### I

### INTRODUCTION

Growing public concern with the environmental effect of governmental action led Congress to enact the National Environmental Policy Act, 42 U.S.C. 4331 et seq. Principally, the Act is a device to insure that governmental agencies critically examine the environmental effect of significant federal action and proposals for legislation. To insure that the government and the public will be fully informed, NEPA requires the executive to take a "hard look" at the environmental consequences of its actions, and to disclose the facts, reasons, and results of its examination in an environmental statement. Essentially, NEPA

forces the decision making process to the surface so it may be reviewed by Congress, government officials, the public, and the courts.

In this suit, the State of California and other plaintiffs attack the Forest Service's far ranging Roadless Area Review and Evaluation (RARE II), alleging that its actions with respect to some forty-seven areas in California ("disputed areas") do not comply with the requirements of NEPA. RARE II seeks to determine the future land use of some sixty-two million acres of roadless national forest land. Although all of the RARE II areas meet the minimal statutory requirements to qualify for official designation as wilderness, the Forest Service in RARE II determined that a substantial majority of these areas should be developed. As required by NEPA, the Forest Service prepared a lengthy environmental impact statement to support its decision.[1] Although the statement is described by defendants as "programmatic" in nature, it supports decisions that will have significant impact on each RARE II area.[2] Accordingly, the sufficiency of the statement under NEPA must be tested by the extent it demonstrates that the Forest Service took a "hard look" at the environmental impact of its actions in each area, and the extent that the Forest Service disclosed its findings as to each area.

The particular deficiency alleged by California is a failure on the part of the Forest Service to critically examine the effect of its decisions upon the wilderness quality of the RARE II areas. My examination of the RARE II environmental statement has convinced me that the Forest Service either never seriously considered the impact of its decision on the wilderness qualities of the RARE II areas, or that the Forest Service has simply failed to disclose the data, assumptions, and conclusions employed by it in such a consideration. Ultimately, the RARE II environmental statement informs Congress and the public that the Forest Service has reached certain conclusions and is prepared to act upon these conclusions. The EIS states that the Forest Service has decided to surrender wilderness values in many areas but does not reveal what it is giving up. It explains that the Forest Service plans to develop the RARE II areas but does not describe how it will develop them nor what effect such development will have. In the course of developing this decision, the Forest Service examined an array of alternative courses of action, all, save one, heavily skewed towards development, without explaining why alternatives skewed towards wilderness were not considered. Although NEPA requires full disclosure and public participation, the Forest Service adopted a method of disclosure and public participation that effectively undercut the possibility of serious public participation in its decision making process.

For these reasons, I hold that the RARE II environmental statement violated the National Environmental Policy Act. Accordingly, I enjoin the Forest Service from developing any of the disputed areas in this lawsuit prior to considering the wilderness values of the areas in compliance with NEPA. My decision in no way is based upon any conclusion that there is a "correct" decision as to how many of these

---

1. Throughout this opinion I refer to environmental impact statements as "EISs", or statements. The RARE II project developed both a draft statement ("DES") and a Final Statement ("FES"). Citations to the final statement are given as "FES".

2. A "programmatic" environmental impact statement is usually developed to support broad policy determinations, or overall national programs. As such, programmatic statements usually do not consider the impact of decisions upon particular areas ("site specific impact"). Such broad EISs are normally sufficient since either the policy being considered does not itself result in site specific impact, or later environmental statements will consider the environmental impact of actions taken with respect to specific areas. See 40 C.F.R. 1500.6(d)(1) (1976); *NRDC v. Administrator* (D.D.C.1978) 451 F.Supp. 1245, 1258–1259; *Kelley v. Butz* (W.D.Mich.1975) 404 F.Supp. 925, 935; *NRDC v. Morton* (D.D.C.1974) 388 F.Supp. 829, 838, aff'd. without opinion, 174 U.S.App.D.C. 77, 527 F.2d 1386, cert. den. 427 U.S. 913, 96 S.Ct. 3201, 49 L.Ed.2d 1204. As I explain, RARE II has both a programmatic and significant, present site specific effect.

areas should be developed and how many should be left as wilderness. The Forest Service bears the responsibility for making that determination, and no court may upset that substantive decision unless it is arbitrary. My conclusion is based solely on the ground that the Forest Service did not comply with NEPA's procedural requirements. Although Congress selected a procedural approach to address the great challenge of environmental management, these requirements cannot be deprecated as "mere procedure" for "it is procedure that marks much of the difference between rule by law and rule by fiat." *Wisconsin v. Constantineau* (1971) 400 U.S. 433, 436, 91 S.Ct. 507, 509, 27 L.Ed.2d 515.

## II

## BACKGROUND [3]

The Forest Service administers the National Forest System comprising 187.7 million acres organized into 154 National Forests. The RARE II areas, ultimately including 2,918 areas covering a little more than 62 million acres, are included in the System. A separate system, the National Wilderness Preservation System, was established in 1964, and presently includes some 187 areas including more than 19 million acres.

In 1972, the Forest Service commenced RARE I, a program to identify roadless areas, and to determine what activities, if any, were appropriate for them. RARE I considered 56 million acres throughout the United States and resulted in the selection of some 21.3 million acres as wilderness study areas. The RARE I program was not supported by an environmental impact statement and its methodology was severely criticized. When the Forest Service attempted to develop certain of the RARE I lands, a federal court enjoined development pending compliance with NEPA. See *Wyoming Outdoor Coordinating Council v. Butz* (10th Cir. 1973) 484 F.2d 1244.

· For several years following RARE I, the Forest Service did not further attempt programmatic consideration of roadless areas. Rather, the Service chose a site by site evaluation during the local forest planning process. Finally, in June, 1977, RARE II was commenced. The asserted purpose of RARE II was to speed the process of wilderness allocation and to open remaining roadless areas to development.

Like RARE I, RARE II sought to inventory roadless areas and then evaluate them. The final result of RARE II was the designation of each area into one of three categories: wilderness, nonwilderness, or further planning. Wilderness designation was a recommendation to Congress for inclusion of an area in the Wilderness Preservation System. Nonwilderness designation meant that the area was open to development without further consideration of wilderness. Further planning was, essentially, a decision not to decide and to leave land use issues to the ordinary forest planning process. Essentially, then, RARE II contemplated two actions: (1) recommendations to Congress for wilderness classification; and (2) an administrative decision to open areas to development and in general not to further consider wilderness issues.

The RARE II process was supported by a draft and final environmental statement. The draft statement identified ten alternative allocation methods which resulted in different percentages of areas designated to wilderness, nonwilderness, and further planning. No officially endorsed proposed action was identified in the draft. The public was invited to comment on various proposed "decision criteria" to be used in selecting the proposed action. These criteria included resource planning goals developed by the Forest Service, comparisons of certain wilderness attributes of the areas including the goals of diversity and accessibility of wilderness areas, public agreement, the cost and impact of wilderness classification, and national issues such as housing

---

**3.** Additional facts are within the body of this opinion. This opinion constitutes the Court's findings of fact and conclusions of law.

needs and inflation. Comments were also invited on allocations for each specific area and approaches to developing alternatives.

The draft was filed on June 15, 1978, and widely distributed. By October, 1978, the cutoff date for receipt of comments, some 264,093 comments had been received. The final statement was filed on January 4, 1979. For the first time, the FES identified a proposed action, which resulted in allocations nationwide of fifteen million acres to wilderness, thirty-six million acres to nonwilderness, and 10.8 million acres to further planning.

Like the draft statement, the final statement is programmatic in form in that it evaluates the areas generically as opposed to individually. In all, eleven alternatives, including the proposed action, are considered. One alternative is "no action", i. e. to continue to determine land use issues at the local planning level. One alternative allocated all areas to wilderness while another allocated all areas to nonwilderness. The remaining alternatives emphasize different factors involving different mixes of decisional criteria with resultant differing percentages of the acreage being allocated to wilderness, nonwilderness, and further planning.

The proposed action is a complex, eleven step decisional process that starts with the partial combination of two alternatives identified in the draft statement. The next ten steps adjust specific area allocations based upon public response, accessibility and distribution targets for wilderness, scores on a Forest Service devised Wilderness Attribute Rating System (WARS), local forester judgment concerning public response and significant adverse effects on local communities, resource planning goals, compelling reasons, and national issues such as energy, inflation, and housing needs.

Unlike the draft statement, the final statement was only circulated to Congress and affected federal agencies and states. The proposed action recommendations were transmitted to President Carter on May 2, 1979, who made some minor changes in the allocations and then transmitted the wilderness recommendations to Congress where it is presently being considered. President Carter stated at that time that "I am asking Secretary Bergland to proceed immediately with the planning and management of these nonwilderness areas under existing law." According to the final statement, areas allocated to nonwilderness were available for development activities on April 15, 1979.

California brought this action against the Secretary of Agriculture and the Forest Service alleging violation of the National Environmental Policy Act, 42 U.S.C. 4331 et seq., the Multiple Use and Sustained-Yield Act, 16 U.S.C. 528 et seq., and the National Forest Management Act, 16 U.S.C. 1604.[4] The Natural Resources Defense Council, Trinity County and the Clear Creek Legal Defense Fund, et al. were permitted to intervene on plaintiff's side. Del Norte, Shasta and Siskiyou Counties, the National Forest Products Association, et al., and Webco Lumber Company, et al., were permitted to intervene on defendants' side.

Plaintiffs dispute the nonwilderness designations of some forty-seven areas in California comprising nearly one million acres of land.[5] They seek summary judgment, a

4. In view of my determination that the procedure resulting in the challenged allocations violates NEPA, I do not reach the Multiple Use and Sustained-Yield Act or National Forest Management Act issues.

5. Several defendants challenge California's standing to bring this action. California brought this suit through its State Resources Agency, an agency with special competence and authority on environmental and land use issues (See e. g. Cal.Pub.Res.Code § 5093.35). The areas in controversy are all within California; development or non-development will directly affect California lands. California thus has standing both under the parens patriae theory (*Washington Util. & Transp. Comm. v. FCC* (9th Cir. 1975) 513 F.2d 1142; *California v. United States* (9th Cir. 1950) 180 F.2d 596, see also *Port of Astoria v. Hodel* (9th Cir. 1979) 595 F.2d 467), and by virtue of its ownership of lands that will be affected by the decision. *City of Davis v. Coleman* (9th Cir. 1975) 521 F.2d 661.

The United States argues that California is barred from raising most of its contentions

declaration of the invalidity of the nonwilderness designations and a permanent injunction against any development of the areas that might change their wilderness characteristics prior to the circulation of an environmental impact statement in compliance with the requirements of NEPA.

## III

## NEPA REQUIRES THAT THE RARE II EIS INCLUDE DETAILED ENVIRONMENTAL ANALYSIS OF THE IMPACT OF ITS LAND USE DESIGNATIONS

The parties first join issue on whether the RARE II EIS must contain site specific analysis of the impact of its land use designations. Plaintiffs insist that detailed site specific analysis of the environmental consequences of the nonwilderness designations must be performed in the RARE II EIS. Specifically, they argue that if the RARE II EIS does not consider the impact of the loss of the wilderness option, it will never be assessed.

Defendants, on the other hand, characterize RARE II as a mere "partial planning decision" with little immediate environmental impact. They assert that since site specific environmental analysis will be required when individual forest management plans are promulgated under the National Forest Management Act, 16 U.S.C. 1604, the environmental impact of the proposed action will be adequately assessed. Both the form and timing of environmental analysis, they argue, is left to the informed discretion of the agency.

NEPA requires a "detailed statement" for every legislative proposal and "other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). In determining whether or not a proposed action requires an environmental statement, and, if so, when such statement must be prepared, the initial inquiry must examine the scope of the proposed action. If an environmental statement is required, the nature and scope of the proposed action will determine the extent of detail, analysis, and information an adequate statement must contain (*Atlanta Coalition v. Atlanta Regional Comm.* (5th Cir. 1979) 599 F.2d 1333, 1344), as well as the range of reasonable alternatives that must be considered. See, e. g. *NRDC v. Morton* (D.C.Cir.1972) 148 U.S. App.D.C. 5, 13, 458 F.2d 827, 835. To put it simply, the type of action proposed dictates the type of environmental analysis required.

### A. Scope of the Proposed Action

The RARE II EIS proposes two distinct types of actions.[6] First, it proposes legislation to add some of the RARE II areas to the National Wilderness Preservation System. Under the Wilderness Act, 16 U.S.C. § 1131 et seq., additions to the Wilderness Preservation System may only be made by Congress. RARE II's wilderness designations are therefore "proposals for legislation" that require an environmental statement. No party in this action challenges these designations.[7]

because it failed to raise them during the comment process following the draft statement. California points out that its comments, although brief, incorporated the exhaustive comments made by the Trinity County Board of Supervisors. Further, every objection made in this lawsuit was raised during the comment process and tabulated by the Forest Service. Laches and failure to exhaust administrative remedies are disfavored doctrines in NEPA cases. See e. g. *County of Suffolk v. Secretary of Interior* (2nd Cir. 1977) 562 F.2d 1368, 1385, cert. den. 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764. Laches, of course, requires a showing of prejudice to the defendant. *Cady v. Morton* (9th Cir. 1975) 527 F.2d 786, 792. Be-

cause of the agency's duty to comply with NEPA, it is difficult to demonstrate prejudice in NEPA actions. Id. at 793. No such showing has been made in the present case.

**6.** RARE II also designated many areas under the "further planning" category. No party challenges these designations. Since the "further planning" designation does not entail action that changes the status quo, it would not appear to constitute a "major federal action" requiring an environmental statement.

**7.** As I indicate throughout this opinion, the RARE II EIS contains a comparative wealth of detail concerning the impact of wilderness clas-

Nonwilderness designation, however, unlike wilderness designation, is an administrative action not requiring legislative implementation. Accordingly, in order to determine whether these designations constitute major federal actions, and, if so, when and in what depth environmental analysis is required, I must first turn to an examination of these designations.

Pending the outcome of the RARE II process, no major development activities were permitted on areas under consideration. By definition, the areas are undeveloped, roadless areas that have not been allocated to nonwilderness uses by a filed land management plan,[8] and meet the minimum criteria for inclusion in the Wilderness Preservation System (see infra). In the past, these lands have been managed to preserve their wilderness qualities. Most of the public use of these areas has been of a type consistent with the lands' wilderness character (FES 47). Present recreational use of the areas nationwide is estimated at more than 32.6 million visitor days annually, or approximately 16% of the total visitor days in the entire National Forest System (FES 14).[9]

Areas allocated to nonwilderness uses are available for the full range of nonwilderness uses including timber harvesting, mining, roadbuilding, intensive grazing, recreational site development, and motorized recreation. Nonwilderness uses will be regulated by existing laws, regulations, and management plans.[10]

As management plans are prepared in accordance with the National Forest Management Act, 16 U.S.C. 1604, areas allocated to nonwilderness will not be considered for further wilderness use. Recent regulations adopted by the Forest Service to implement the new requirements of the National Forest Management Act provide that areas designated nonwilderness by RARE II "will [not] be considered for designation as wilderness until a revision of the forest plan. . . ." 44 F.R. 53988 § 219.12(e) (September 17, 1979).

The United States conceded at oral argument that RARE II and this regulation bar a consideration of the wilderness features of any given area during the preparation of the "first generation" of forest management plans.

The Forest Service intends to complete the management planning process by 1983; in any event, the National Forest Management Act requires completion of the plans by 1985. 16 U.S.C. 1604(c). Forest management plans adopted under the new regulations must be revised every ten years, and may be revised more frequently if condi-

---

sification on resource availability and development opportunities. While the Court expresses no opinion as to the validity of these allocations, the scope of this part of the RARE II proposal, and accordingly the type of environmental analysis required by NEPA, is distinct from the nonwilderness allocations. Accordingly, I find that the wilderness proposals are severable from the nonwilderness proposals, and will not consider the wilderness proposals further in this opinion.

8. An exception was made for some 34 areas nationwide for which forest management plans had been filed, because the Forest Service determined that additional review was necessary. Although the balance of the RARE II areas have no general forest management plans, some of them have more specific plans that provide for various types of development activities. The RARE II process, however, "froze" these plans, and no development has as of yet been commenced on any of the areas in controversy.

9. By far most of the use involved picnicking, camping, cross-country skiing, water based recreation, hunting, fishing, nonhunting wildlife activities, and nonmotorized use. Less than three million visitor days were spent in motorized use. (FES at 14).

10. "Under nonwilderness management, timber may be cut, sites for intensive recreation . . . developed, and minerals extracted. Development of each roadless area would be integrated into the development plan for the entire forest. For most RARE II areas, land management plans for roadless areas have not been developed. Thus, each roadless area's role in the National Forest's development has usually not been determined and the level of outputs and roads needed could only be estimated. In particular, the time sequence of development of each area not designated as wilderness has not been determined. Some of these areas may be developed immediately, others not for several decades." (FES p. W–3).

tions change or public demand requires such changes. When a plan is revised, the Forest Service may once again consider wilderness uses of the area in question. 44 F.R. 53988, §§ 219.12(e), 219.11(f).

Thus, at a minimum, areas designated nonwilderness will be managed for nonwilderness uses for period of time ranging ten to sixteen years. At no point during this period, unless conditions change, may the Forest Service consider wilderness features or uses.

Defendants argue, however, that wilderness values will be considered and protected during this period notwithstanding the Forest Service regulations.

First, defendants contend, any management plan adopted under the new regulations will be accompanied by an environmental statement if the new plan significantly changes current uses. 44 F.R. 53988 § 219.11(b)(2)(i). The regulations, however, expressly preclude consideration of wilderness. Thus, although a forest plan environmental statement may be required and may examine some types of environmental impact resulting from development (e. g., pollution), the central values of wilderness—opportunities for solitude, primitive recreation, and primeval character, 16 U.S.C. § 1131(c), cannot be considered.

Moreover, even if specific environmental effects which could implicate wilderness values are examined, the wilderness alternative, with its affirmative legislative safeguards (see infra), cannot be examined. Finally, the regulations only require environmental statements for revisions or amendments to forest management plans. Lesser

planning activities that are themselves not major federal actions will not be subject to environmental analysis, restricted or otherwise. Thus there is the present danger of the accretion of small deleterious effects that could "whittle away" wilderness values. See infra.

Defendants argue, however, that the wilderness alternative will still be considered *sub rosa* since the environmental statement accompanying each new management plan must consider a "no action" alternative—i. e. "the most likely condition expected to exist in the future if the current management direction would continue unchanged." 44 F.R. 53988 § 219.5(f)(1)(ii). Defendants contend that the no action alternative is tantamount to the wilderness alternative since by definition the RARE II areas are in a natural condition.[11]

While it is true that the areas are presently in a natural condition, many of these areas, as I have noted, have specific management plans that contemplate development activities. For these areas, the no action alternative is quite different from the wilderness alternative, since the "current management direction" entails development.

Even if the no action alternative meant leaving the area in its natural state, however, it will not adequately assess wilderness values for two reasons. First, although no action might mean leaving an area in its natural condition, it will not include the affirmative safeguards of the Wilderness Act.[12] Secondly, however, the no action alternative will not operate as a wilderness alternative because under statu-

11. In the balance of the discussion I point out that in fact the "no action" alternative simply is not tantamount to a wilderness designation. In doing so I do not mean to suggest that a "*sub rosa*" reaching of a wilderness effect would in any event satisfy legal requirements. As is exhaustively discussed infra the whole purpose of NEPA is to insure openly reached decisions which fully discuss the environmental consequences of the Government's decision. Thus "*sub rosa*" environmental consideration violates not merely the spirit but the letter of NEPA.

12. Areas within the Wilderness Preservation System must be administered to preserve their wilderness character, 16 U.S.C. § 1133(b), and shall not include commercial enterprises, permanent roads, temporary roads, the use of motor vehicles, equipment, motorboats, aircraft or other motorized transport, and may not include any structure or installation. 16 U.S.C. § 1133(c), 36 C.F.R. §§ 293.6, 293.8. The geographic integrity of the area is protected by its implementing legislation; only a congressional action can remove an area from the Wilderness System.

tory law and regulation neither the purpose, effect or advantages of no action can involve wilderness considerations.

As I have indicated, the RARE II decision forecloses wilderness uses of areas designated for nonwilderness. Under the National Forest Management Act, 16 U.S.C. § 1604, and the Multiple Use Sustained-Yield Act, 16 U.S.C. § 528 et seq., the Forest Service is required to administer the National Forests to "provide for multiple use and sustained yield of the products and services obtained therefrom . . . and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness . . . ." 16 U.S.C. § 1604(e)(1). Aside from wilderness uses, the Forest Service must "develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom." 16 U.S.C. § 529.

If the Forest Service cannot consider wilderness values, then it is *required*, in determining the uses of the national forests, to consider only the other allowable uses of the lands. Thus, under RARE II and the new regulations, the rationale or justification for a "no action" alternative cannot rely upon wilderness uses or values.

Forest Service regulations require that "the purposes of the management direction proposed" be stated for each alternative discussed. 44 F.R. 53988 § 219.5(f)(2)(iv). If the no action alternative cannot rely upon any wilderness "purpose" what purposes can it rely upon? Obviously, under the regulations and the statutes, it can only rely upon the promotion of other alternative multiple uses, many of which are development oriented and thus hostile to wilderness use. Conceivably, other factors may justify the "no action" alternative such as budgetary constraints or the economics of development.

Thus the "no action" alternative will never operate as a wilderness alternative. It will not even promote wilderness oriented values unless (1) present resource management plans do not contemplate development, (2) no action is supported by reasons unrelated to wilderness considerations, and (3) management of the area includes the type of affirmative protection in the Wilderness Act. Since the sine qua non of the nonwilderness designations is development and resource exploitation, it is inherently improbable that this fortunate combination of factors will occur.[13]

Nonwilderness designation thus results in three interrelated types of impact upon wilderness values. First, management planning will not consider mitigation measures that might minimize the impact of development upon the wilderness characteristics of an area. Second, and most obviously, the areas will not enjoy the affirmative protections of wilderness classification. Third, the opportunity for wilderness classification will be permanently foreclosed on many of the areas because development activities will change the nature of an area to the point that it will no longer meet the minimal criteria for inclusion in the wilderness system.

These criteria require an area to be "untrammeled by man," "undeveloped . . . retaining its primeval character . . . without permanent improvements or human habitation . . . with the imprint of man's work substantially unnoticeable . . . ." and to include "outstanding opportunities for solitude or a primitive and unconfined type of recreation . . . ." Additionally, the area must have at least five thousand acres of land or be of "sufficient size as to make practicable its preservation and use in unimpaired condition . . . ." 16 U.S.C. § 1131(c).

Not only is it likely that nonwilderness uses would result in the noticeable imprint of man's works, but even if less radical development occurs, a variety of projects

---

**13.** Decisionmaking records of the RARE II process indicate that significant logging, road-building, and recreational site development ac- tivities are contemplated for most of the disputed areas. See infra.

could "whittle away" the size of a potential wilderness area to the point that it would be impracticable to manage it as wilderness. In addition, a variety of secondary environmental effects resulting from development may further undercut the wilderness value of an area: soil erosion from roadbuilding and timber harvesting, water quality and fishery degradation, air pollution from the use of fossil fuels and slash burning, adverse consequences from the use of chemical herbicides, pesticides, and fertilizers used in timber and range management, the decline in the number and types of wildlife and plant species, increased vulnerability of species deriving from uniform timber treatment, the destruction of solitude and beauty, and the diminution of wild and natural areas available for scientific study.

Despite these threats, the impact of these consequences upon wilderness values cannot be considered during the land management process and, of course, wilderness classification itself cannot be raised or recommended. Since any environmental statement prepared during the first generation of forest management plans cannot consider wilderness, the proposed management plan will never be compared with or assessed against wilderness values. In other words, although the forest plan environmental statement may consider other environmental effects, it will never raise salutary questions about the advantages of protecting wilderness values, the effect of wilderness lost, or the potentially permanent loss of the wilderness option. Although wilderness values may again be examined in ten to sixteen years, the wilderness character of an area in the meantime may be so irreparably changed that it will fail to meet the minimum criteria for wilderness classification. Finally, even if an area is presently unsuitable for formal wilderness classification, it may still contain wilderness values that could be lost to development. These values or mitigation measures to preserve these values will not be assessed or otherwise examined during the forest planning process.

### B. *Major Federal Action*

■ Notwithstanding the effects of non-wilderness designation, an environmental impact statement analyzing these effects is only required if the action is a "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Generally, the duty to prepare an environmental statement is triggered when there is a proposal to change the status quo. *Committee for Auto Responsibility v. Solomon* (D.C.Cir.1979) 195 U.S. App.D.C. 178, 188–9, 603 F.2d 992, 1002–3. RARE II designations change the status quo by foreclosing the consideration of wilderness in the planning process. In order to determine whether the RARE II process itself, as well as specific area designations require an environmental statement, then, our inquiry must be whether or not such actions constitute "major federal actions," within the meaning of NEPA.

The applicable Council of Environmental Quality regulations [14] define "actions" to include the "making, modification, or establishment of regulations, rules, procedure and policy." 40 C.F.R. § 1500.5(a)(3) (1976). Thus, the RARE II designations are "actions."

The issue of whether they are "major" actions, while more complex, also seems relatively clear. The regulations define "major federal actions" to include actions where there "is a *potential* that the environment may be significantly affected. . . ." 40 C.F.R. 1500.6(a) (Emphasis added). See also *City of Davis v. Coleman* (9th Cir. 1975) 521 F.2d 661, 673 (an environmental statement is required "whenever a project *may* cause a significant degradation of some . . . environmental factor."). The environmental statement must be prepared even if the action merely permits or autho-

---

14. These regulations are entitled to substantial deference. *Andrus v. Sierra Club* (1979) 442 U.S. 347, 357, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943, 952. The regulations have since been revised, 40 C.F.R. 1500 et seq. (1978). The new regulations do not apply to actions in which a draft statement had been filed prior to July 30, 1979. 40 C.F.R. 1506.12(a) (1978). Unless otherwise noted, therefore, all citations are to the earlier regulations.

rizes major actions by other parties, governmental or private, that may significantly affect the environment. See, e. g. *Scientists' Inst. for Pub. Info. v. Atomic Energy Comm.* (D.C.Cir.1973) 156 U.S.App.D.C. 395, 404, 481 F.2d 1079, 1088; *NRDC v. Morton* (D.D.C.1974) 388 F.Supp. 829, 834, aff'd without opinion, 174 U.S.App.D.C. 77, 527 F.2d 1386, cert. den. 427 U.S. 913, 96 S.Ct. 3201, 49 L.Ed.2d 1204.

It is clear that the RARE II process is itself a major federal action requiring an environmental statement. Indeed, we need only examine the Forest Service's own characterization of the RARE II process to resolve the issue: "major decisions are involved in this process that may have significant effects on balance and availability of commodity outputs and the resultant social and economic environment and with potential to impact physical and biological resources." (FES at 2).

It is also clear that specific activities on individual areas may be major federal actions requiring an environmental impact statement. See, e. g. *Cady v. Morton* (9th Cir. 1975) 527 F.2d 786, 796 (application for approval of mining plan covering 770 acres); *Minnesota Pub. Int. Res. Group v. Butz* (8th Cir. 1974) 498 F.2d 1314, 1323 (modification of existing contracts for logging in Boundary Waters Canoe Area); *Wyoming Outdoor Coordinating Council v. Butz* (10th Cir. 1973) 484 F.2d 1244 (authorization of clearcutting on 670 acres); *Kelley v. Butz* (W.D.Mich.1975) 404 F.Supp. 925 (chemical spraying of 84 acres); *NRDC v. Morton* (D.D.C.1974) 388 F.Supp. 829, 834 aff'd without opinion 174 U.S.App.D.C. 77, 527 F.2d 1386, cert. den. 427 U.S. 913, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (single grazing permit may be major federal action).

In some ways, of course, permanently foreclosing the wilderness alternative and foreclosing consideration of wilderness values for a particular area may have longer lasting effect than an individual project, whose impact may, by itself, be limited or transitory. RARE II designations are in the nature of land use decisions that direct and channel all types of land use in the future. Individual developments that in themselves do not constitute a major federal action may, by accretion, permanently remove the possibility of wilderness classification or undermine wilderness values.

In determining the significance of a non-wilderness designation for a particular area, the importance Congress has placed on wilderness preservation must not be overlooked. First, the preservation of "an enduring resource of wilderness" is a declared national policy. 16 U.S.C. § 1131(a). Second, the Forest Service has been given affirmative duties to consider existing and potential wilderness areas during its forest planning process.[15] In developing, maintaining and revising forest plans, the Forest Service is required to provide for "coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and *wilderness* . . . ." 16 U.S.C. § 1604(e)(1) (Emphasis added). Moreover, in specifying guidelines for management planning, the Forest Service must "insure consideration of the economic and environmental aspects of various systems of renewable resource management . . . to provide for outdoor recreation (*including wilderness*), range, timber, watershed, wildlife and fish . . . ." 16 U.S.C. § 1604(g)(3)(A) (Emphasis added).[16]

Contrary to defendant Webco's assertion, these provisions are not limited to requiring coordination solely with existing official wilderness areas. Both the legislative history, and the contemporaneous construction of the statute by the Forest Service indicate that in addition to existing wilderness areas, both potential wilderness areas and wilderness values in general must be considered. See S.Rep. 94–893 (94th Cong.2d Sess.) at 10; S.Rep. 94–1335 (94th Cong.2d Sess.) at 24–25, U.S.Code Cong. & Admin.

---

**15.** These duties, arising from the National Forest Management Act, are independent of and in addition to the duty to consider the environmental impact of action established by NEPA.

**16.** Additionally, Congress has declared that the establishment of wilderness areas is consistent with the Multiple Use and Sustained-Yield Act. 16 U.S.C. 529.

News 1976, p. 6662; 44 F.R. 53988, §§ 219.- 6(a), 219.12(b)(3).

The great importance Congress has placed on wilderness, and the affirmative duty of the Forest Service to consider it during the forest planning process, combined with the fact that individual development projects in themselves may be major federal actions, convinces me that individual nonwilderness designations constitute major federal actions that must be assessed in an environmental impact statement. RARE II designations change the forest planning process by deciding wilderness issues prior to local forest planning consideration of potential uses. RARE II forecloses consideration of wilderness values or the wilderness alternative during the future forest planning process. The designations are themselves tantamount to a decision to engage in development activities on the individual areas. In sum, it is clear that RARE II nonwilderness designations may significantly affect the environment of individual RARE II areas.

Defendants argue that since future development projects are not known at this time, it is impossible to assess their environmental impact. This argument, however, does not address the question of whether or not an environmental statement is required, i. e. whether or not the decision constitutes a major federal action; it only raises the questions of how and when the environmental impact must be assessed. See *Environmental Defense Fund, Inc. v. Andrus* (9th Cir. 1979) 596 F.2d 848. I now turn to these questions.

### C. *Timing and Method of Environmental Analysis*

Defendants argue that, notwithstanding the fact that allocation of specific areas to development may constitute major federal action requiring an environmental impact statement, the decisions concerning when the Forest Service must analyze environmental impact, as well as the method of analysis are left to the informed discretion of the Forest Service. Defendants argue that since specific development plans for particular areas were unknown during the RARE II process, it was neither arbitrary nor capricious for the Forest Service to defer environmental analysis of site specific impact until a specific project was examined. In the meantime, defendants urge, the preparation of the programmatic RARE II EIS satisfied the requirements of NEPA.

Defendants primarily rely upon *Kleppe v. Sierra Club* (1976) 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576, and *County of Suffolk v. Secretary of Interior* (2nd Cir. 1977) 562 F.2d 1368, cert. den. 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764. Neither case supports defendants' position. In the present case, unlike both *Kleppe* and *Suffolk,* the Forest Service has proposed major federal action, and insured that the environmental impact of its decision upon wilderness values *cannot* be assessed prior to development. It is a fundamental tenet of NEPA law that the filing of an environmental statement must precede rather than follow federal action. See, e. g. *Cady v. Morton* (9th Cir. 1975) 527 F.2d 786.

In *Kleppe v. Sierra Club,* supra, the Supreme Court reversed the appellate court decision requiring a regional environmental impact statement prior to further development of coal reserves in the Northern Great Plains region. Although both a site specific and a nationwide programmatic environmental impact statement had been prepared, the Court of Appeals devised a balancing test to determine when, prior to a formal proposal for regional development, an environmental statement must be prepared for regional development.

The Supreme Court rejected the Court of Appeals' balancing test. NEPA, the Court explained, only requires an environmental statement when the agency makes a proposal for federal action. "The procedural duty imposed upon agencies . . . is quite precise, and the role of the courts in enforcing that duty is similarly precise. A court has no authority to depart from the statutory language and, by a balancing of court-devised factors, determine a point during the germination process of a potential proposal at which an impact statement *should be prepared.*" 427 U.S. at 406, 96

S.Ct. at 2728. The Court found that no proposal for regional development had been made, and therefore no regional environmental statement was required. Id. 427 U.S. at 400, 96 S.Ct. 2718. Further, the determination of the necessity for, and the scope of a programmatic statement "requires the weighing of a number of relevant factors, including the extent of the interrelationship among proposed actions and practical considerations of feasibility. Resolving these issues . . . is properly left to the informed discretion of the responsible federal agencies." Id. 427 U.S. at 412, 96 S.Ct. at 2731. Thus the essence of *Kleppe* is no more than that the federal courts are without power to order an EIS prior to an actual proposal for major federal action.

In contrast to *Kleppe,* however, in the present case there *is* an actual proposal for major federal action: the land use allocation decision made by the RARE II process. Thus the Forest Service has reached the "statutorily fixed point" when an environmental statement must be prepared. See *Environmental Defense Fund, Inc. v. Johnson* (S.D.N.Y.1979) 476 F.Supp. 126, 128.

Defendants argue, nonetheless, that they must be permitted to defer site specific analysis until such time as specific development plans are proposed. To rule otherwise, they insist, would require them to engage in speculation and "endless hypothesizing as to remote possibilities." *County of Suffolk v. Secretary of Interior,* supra at 1379.

■ While it is true that NEPA does not require a "crystal ball inquiry", *Scientists' Inst. for Pub. Info. v. Atomic Energy Comm.,* supra 156 U.S.App.D.C. at 408, 481 F.2d at 1092, uncertainty or the necessity for forecasting environmental impact can not forever excuse environmental analysis. *City of Davis v. Coleman* (9th Cir. 1975) 521 F.2d 661, 676, see also *State of Alaska v. Andrus* (D.C.Cir.1978) 188 U.S.App.D.C. 202, 210, 580 F.2d 465, 473, vacated in part on other grounds 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315. Yet as I have noted, the RARE II process largely avoids site specific

wilderness analysis of the areas allocated to nonwilderness while barring such analysis in the future during the forest planning process.

■ NEPA does not require that *complete* information concerning the environmental impact of a project must be obtained before the action can be implemented. There may well be situations where the unavailability of information may require delays in the preparation of an impact statement "if the procedures of NEPA are to be conducted in a meaningful way." *Jicarilla Apache Tribe v. Morton* (9th Cir. 1973) 471 F.2d 1275, 1280–1281. If, on the other hand, the proposed action forecloses future consideration of an otherwise reasonable action or alternative then, at minimum, the environmental impact of the foreclosed action or alternative must be assessed. Simply put, the agency may not evade its duty. It must either assess the impact of the decision, or, if the factual situation will not permit that assessment (thus preventing the agency from performing its NEPA duties), the decision must be deferred until the agency has a sufficient factual basis to perform its environmental analysis. All significant environmental effects that can reasonably be expected to flow from the proposed major action, it should be remembered, must be assessed prior to implementing the major federal action. *County of Suffolk v. Secretary of Interior,* supra at 1378.

The fact that an agency elects a "programmatic" approach does not permit it to avoid the analysis that NEPA requires. Thus in the present case, no objection can properly be made to the Forest Service's election of a programmatic approach provided that sufficient analysis of the environmental impact of the decision actually reached is performed. Since the RARE II decision, however, precludes future site specific analysis of the impact on the wilderness character of an area allocated to nonwilderness, NEPA requires analysis of that effect in the RARE II EIS.

Defendants' reliance on *County of Suffolk v. Secretary of Interior,* supra, is mis-

placed. In *Suffolk,* a programmatic environmental statement concerning proposed oil and gas leases on the Outer Continental Shelf was challenged because it did not consider or project the environmental consequences of possible gas pipeline routes. The area involved covered two hundred and fifty square miles, and it was then unknown where or whether oil would be found and thus where or whether pipelines would be placed. Moreover, the Secretary of Interior planned to prepare a specific environmental statement when more definite information was available.

The court found that nothing in the program committed the Secretary to specific modes of transportation or routes. In determining whether environmental analysis could properly be deferred under such circumstances, the court considered both whether obtaining information was "meaningfully possible" at the present time, and how important the additional information would be in determining whether or not to proceed with the project. Id. at 1378.[17] The court specifically noted, however, that where the "major federal action under consideration, once authorized, cannot be modified or changed, it may be essential to obtain such information as is available, speculative or not, . . . ." Id. at 1378.

Ninth Circuit cases are fully in accord with this view. In *Environmental Defense Fund, Inc. v. Andrus* (9th Cir. 1979) 596 F.2d 848 (per curiam), the Court considered whether or not an environmental impact statement was required for either an industrial water marketing program or for individual option contracts for water. The Court first distinguished *Kleppe* since in the case at bar both the overall marketing plan and the option contracts were proposals for major federal action and not mere "contemplation." Id. at 851. The court specifically rejected the claim that uncertainty about industrial use of the water when and if the options were exercised excused environmen-

tal analysis until the options had been exercised. "Any uncertainty about the details of subsequent use of the diverted water does not obviate the importance of the decision to divert and the necessity to evaluate the environmental consequences of that decision." Id. "[T]he government cannot unilaterally change its mind . . . . . For the term of the contract, it is an 'irreversible and irretrievable commitment of the availability of resources.' As such, it is a major federal action requiring an EIS." Id. at 852. See also *Port of Astoria v. Hodel* (9th Cir. 1979) 595 F.2d 467, 478.

■ *Environmental Defense Fund v. Andrus* squarely controls in the present case. Since by virtue of RARE II and its implementing regulations the Forest Service is now making a decision that limits its discretion in the future and prevents later environmental assessment of wilderness values, it must assess the environmental consequences of its actions now. Thus, the validity of the RARE II EIS must be tested by whether or not its environmental analysis of both the overall program and specific area designations is NEPA sufficient. See *NRDC v. Administrator* (D.D.C.1978) 451 F.Supp. 1245, 1258–1260; *Kelley v. Butz* (W.D.Mich.1975) 404 F.Supp. 925, 935; *NRDC v. Morton* (D.D.C.1974) 388 F.Supp. 829, 838–840, aff'd without opinion (D.C. Cir.) 174 U.S.App.D.C. 77, 527 F.2d 1386, cert. den. 427 U.S. 913, 96 S.Ct. 3201, 49 L.Ed.2d 1204.

## IV

THE RARE II EIS DOES NOT ADEQUATELY ANALYZE OR DISCLOSE THE ENVIRONMENTAL IMPACT OF ITS NONWILDERNESS DESIGNATIONS

### A. *General Principles*

■ The court's role in enforcing NEPA is limited and precise. The court "should

---

17. *Suffolk* could be characterized as a "timing" decision that violates the *Kleppe v. Sierra Club* stricture against balancing tests that require an environmental statement prior to an actual proposal. On the other hand, the decision may be read to mean simply that since no proposal had yet been made for pipeline routes, no environmental statement was necessary, and thus as wholly consistent with *Kleppe.*

[not] substitute its judgment for that of the agency as to the environmental consequences of its actions. The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences . . . ." *Kleppe v. Sierra Club,* supra 427 U.S. 410, n. 21, 96 S.Ct. at 2730.

The vehicle which is established by NEPA to insure that the agency has taken a "hard look" is the environmental impact statement.

The National Environmental Policy Act requires every major federal action to be accompanied by a "detailed statement" that analyzes:

(i) The environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C)

■ An environmental impact statement serves two purposes. First, it requires decisionmakers to examine and consider environmental factors before acting. Secondly, it acts as an environmental "full disclosure" statement, permitting other officials, Congress, and the public to evaluate the environmental consequences on their own. *Trout Unlimited v. Morton* (9th Cir. 1974) 509 F.2d 1276, 1283, see also *State of Alaska v. Andrus* (D.C.Cir.1978) 188 U.S. App.D.C. 202, 211, 580 F.2d 465, 474 vacated in part on other grounds, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315; *Silva v. Lynn* (1st Cir. 1973) 482 F.2d 1282, 1284–1285. By requiring a hard look, the Act insures the integration of environmental considerations into the decision making process. The environmental statement is the "outward sign that environmental values and consequences have been considered during the planning stage of agency actions." *Andrus v. Sierra Club* (1979) —— U.S. ——, ——, 99 S.Ct. 2335, 2337, 60 L.Ed.2d 943, 947. Thus NEPA is a deliberate command to consider environmental factors, and not shunt them aside in the "bureaucratic shuffle." *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n* (1976) 426 U.S. 776, 788, 96 S.Ct. 2430, 49 L.Ed.2d 205.

As noted, the statement is the vehicle to test agency compliance. Accordingly, "[j]udicial enforcement of NEPA includes strict compliance with the disclosure and procedural provisions of the Act. Nevertheless, the test of EIS adequacy is pragmatic and the document will be examined to see if there has been a good faith attempt to identify and to discuss all foreseeable environmental consequences." *Warm Springs Dam Task Force v. Gribble* (9th Cir. 1977) 565 F.2d 549, 552.

■ The "action forcing" procedures at the heart of the NEPA statement process require a "finely tuned and 'systematic' balancing analysis" by the agency. *Calvert Cliffs Coordinating Comm. v. Atomic Energy Comm.* (D.C.Cir.1971) 146 U.S.App.D.C. 33, 37, 449 F.2d 1109, 1113. A mere admission that the proposed action will have adverse impact, without detail concerning the scope or extent of that impact or a weighing of environmental benefits versus economic costs, does not comply with this mandate. *National Wildlife Federation v. Andrus* (D.D.C.1977) 440 F.Supp. 1245, 1252–1253; *Environmental Defense Fund v. TVA* (E.D.Tenn.1972) 339 F.Supp. 806, aff'd. 468 F.2d 1164 (6th Cir. 1972); see also *Chelsea Neighborhood Assoc. v. U. S. Postal Service* (2nd Cir. 1975) 516 F.2d 378, 388. It is against these demanding standards that the RARE II EIS must be measured.

### B. Assessment of Individual Areas

The Environmental Statement acknowledges that, generally, areas with proven resources were designated for nonwilderness, regardless of wilderness qualities present, or the lack of any specific development plans for the area (FES 95). At oral

argument, the Forest Service explained that by designating an area for nonwilderness, the Forest Service determined that it was willing to forego the wilderness option in order to maintain the opportunity for development. The environmental statement rationalizes, however, that since the actual course of development for a particular area is presently unknown, it is impossible to analyze specific environmental effects of development. Accordingly, the effect of development was not "an analysis factor" in the environmental statement. (FES 40, 106 com. 23, 24, 107 com. 28). As I have indicated, the RARE II allocation decisions are themselves major federal actions requiring an impact statement. Further, since later planning will not consider wilderness as an alternative land use, the NEPA sufficiency of the RARE II EIS must be tested by its analysis of wilderness issues. I now turn, first, to a discussion of what type of site specific analysis is required by NEPA.

1. *Necessity of Site Specific Discussion*

The nature and scope of the proposed action will, of course, determine the extent of detailed analysis required in an environmental statement. *Atlanta Coalition v. Atlanta Regional Comm.* (5th Cir. 1979) 599 F.2d 1333, 1344. At the very least, however, a discussion of the factors listed in NEPA is required, 42 U.S.C. § 4332(C). The examination of these factors must be conducted in a manner calculated to advance the dual interests of public disclosure and agency consideration of environmental factors.

Regulations promulgated by the Council of Environmental Quality specify the type of data and analysis required. The statement must provide a "description of the proposed action, a statement of its purposes, and a *description of the environment affected*, including information, summary technical data, and maps and diagrams where relevant, adequate to permit an assessment of potential environmental impact by community agencies and the public . . . The statement should also *succinctly describe the environment of the area affected as it exists prior to the proposed action. . . ."* 40 C.F.R. 1500.8(a)(1). (italics added). The statement must disclose the probable impact of the proposed action, including direct and secondary or indirect effects, 40 C.F.R. 1500.8(a)(3), and the extent to which the proposed action forecloses future options. 40 C.F.R. 1500.8(a)(6).[18]

Site specific analysis is essential to meaningful environmental analysis. Broad, generic statements neither inform the public of the environmental consequences of action, nor require the agency to take a "hard look" at environmental factors. See e. g. *National Wildlife Federation v. Andrus* (D.D.C.1977) 440 F.Supp. 1245, 1252–1253; *Kelley v. Butz* (W.D.Mich.1975) 404 F.Supp. 925, 935; *NRDC v. Morton* (D.D.C.1974) 388 F.Supp. 829, 838–840, aff'd without opinion 174 U.S.App.D.C. 77, 527 F.2d 1386, cert. den. 427 U.S. 913, 96 S.Ct. 3201, 49 L.Ed.2d 1204; *Environmental Defense Fund v. TVA* (D.C.Tenn.1972) 339 F.Supp. 806, 809, aff'd 468 F.2d 1164 (6th Cir. 1972); See also *Chelsea Neighborhood Assoc. v. U. S. Postal Service* (2d Cir. 1975) 516 F.2d 378, 388.

Site specific information is especially vital in considering wilderness issues. The "value" of wilderness is not easily reduced to objective or quantitative terms. Wilderness is a finite resource that exists in many forms. Just as land is considered unique before the law, so too is wilderness: each area is composed of unique features of topography, vegetation, flora and fauna, scenery, opportunities for solitude and recreation, and scientific and cultural interest. The Craters of the Moon, Glacier Peak, Lassen Volcanic, John Muir, Great Sand Dunes, and Dome Land Wilderness areas, for example, are each composed of distinct and unique features that are not easily compared, much less are they capable of being reduced to generic terms.

18. The new regulations are consistent with these mandates. See 40 C.F.R. 1502.15, 1502.16 (1978).

## 2. *Content of EIS*

The EIS does not comprehensively describe any of the RARE II areas. In response to comments on the draft statement noting this deficiency, the Forest Service asserted that "individual descriptions . . . would produce an extremely voluminous document. . . . The public [is] . . . encouraged to get on the ground in these areas to learn more about them." (FES 108 com. 35).[19]

In a series of computer printouts contained in the EIS, some site specific information is listed for each area. In these printouts, information is listed as to: (1) the acreage and location of the area; (2) its classification as one of forty basic landform types; (3) its Bailey-Kuchler classification as to ecosystem type (the Bailey-Kuchler classifications do not identify ecosystems covering less than 50,000 acres);[20] (4) the number of wilderness associated wildlife species in the area (but not the type or quantity of each); and (5) a competitive rating score of each area's wilderness attributes (see infra). In addition, the EIS includes a map of the United States indicating the accessibility and distribution of the RARE II areas.

By contrast, a comparative wealth of information is provided concerning development potential and resource output. Each area is given a rating for development potential which measures optimum resource potential versus cost of development. Maximum yield estimates are given for timber, mineral, gas, oil, uranium, coal, geothermal potential, grazing, and recreational use. Multi-county analysis of the economic impact of designations are included in supplements to the draft statement.

It is important to understand what the statement does not consider. Nowhere is there a description of the presently existing wilderness characteristics of each area. It does not identify any unique characteristics of any area, whether it be notable scenic landmarks, or rare and endangered populations of wildlife. Although the statement briefly discusses the broad generic values of wilderness, it never considers the specific values of each area. Moreover, in its discussion of the generic values of wilderness, it never examines the economic and beneficial environmental values of wilderness: tourism, sales of wilderness-oriented recreational equipment, conservation of wildlife and flora populations, soil conservation and stability, watershed protection, clean air and water, and like values.

The statement never examines the impact of nonwilderness designations upon each area's wilderness characteristics and values. Instead, the statement merely states that development plans are unknown at the present time and thus developmental impact cannot be projected. The result is classically Catch 22. The development effect on wilderness is not considered now and it is unlikely that any environmental statement in the future will discuss it. Thus the impact of development on the wilderness values of a particular area (e. g. this scenic area lost) or the secondary effect of the loss of wilderness (e. g. impact on water quality or wildlife, etc.), or mitigation measures that might protect wilderness values despite development plans (e. g. confining development to a specific area or limiting the types of development allowed) will most likely never be considered.

Finally, the statement never considers the effect of development on future opportunities for wilderness classification, namely, the effect on the "benchmark" characteristics identified in the Wilderness Act. 16 U.S.C. § 1131(c).

**19.** This statement encouraging the public (and one presumes Congress also since it must decide which areas to include in the Wilderness System) to visit nearly 3000 areas in order to get individual descriptions of them suggests that the environmental statement has failed its disclosure purpose. Moreover, it is extremely unlikely to have been feasible for anyone to visit all the areas during the comment period following the draft statement.

**20.** Since the Wilderness Act deals with areas as small as 5,000 acres, 16 U.S.C. § 1131(c), the Bailey-Kuchler classification does not provide any meaningful site specific information.

If the Forest Service is willing to forego wilderness values without considering how else the land should be utilized, it must at least clearly describe in detail what it proposes to give up. As I explained earlier, uncertainty as to the course of future development is no excuse for abandoning environmental analysis, especially when irreversible and irretrievable commitments of resources are presently made.[21]

Instead of examining the impact of the loss of wilderness attributes *and* the loss of the option to classify an area formally as wilderness, the Forest Service chose to examine only the costs of foreclosing development. Since neither the values gained by wilderness classification, nor the values lost by development were ever explored in the EIS, it failed to fulfill the twin NEPA goals of disclosure and demonstrated agency consideration of environmental factors.

Defendants argue, however, that material incorporated by reference in the EIS met the burden of site specific examination of environmental factors. Specifically, they argue that the "worksheets" prepared to rate each area's wilderness attributes adequately describe each area as well as disclose the potential impact of nonwilderness designation.

As I explained above, each area was given a wilderness attribute rating. The wilderness attribute rating system (WARS) purports to give each area a rating based on the attributes of wilderness listed in the Wilderness Act. Although only a single score is listed in the EIS, the worksheets prepared by Forest Supervisors scored the areas *competitively* on their naturalness, apparent naturalness, opportunity for solitude, and opportunity for primitive recreational experience. In addition, supplementing scores on ecological, scenic, geographic, and cultural values were utilized to break "ties" between areas.

Only the final ratings were listed in the EIS. The actual worksheets were only available at local regional Forestry offices for the region in which a specific area was situated. Under certain circumstances the law permits incorporation by reference; three doctrines, however, limit an agency's attempt to incorporate material by reference. First, the material must be "reasonably available for inspection by potentially interested persons within the time allowed for comment." (40 C.F.R. 1502.21 (1978)). Second, the statement itself must still be understandable without undue cross reference. 40 C.F.R. 1500.8(b) (1976). Finally, the appropriateness of incorporation by reference must be judged by a rule of reason. *Life of the Land v. Brinegar* (9th Cir. 1973) 485 F.2d 460, 468, cert. den. 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312. Although in the past, supporting technical material or studies have been permitted to be incorporated by reference into an environmental statement (See e. g. *Trout Unlimited v. Morton* (9th Cir. 1974) 509 F.2d 1276, 1284; *Life of the Land v. Brinegar*, supra; *American Timber Co. v. Berglund* (D.Mont.1979) 473 F.Supp. 310, 314), this Court has found no case allowing material central to the adequacy of an environmental statement to be incorporated by reference. As I explained, absent the WARS worksheets, the EIS is fatally deficient in site specific analysis. Further, the worksheets were not located in

---

**21.** This Court finds it hard to believe that the Forest Service could not project likely development activities for most areas. During the decision process, nearly every area in dispute was placed in the nonwilderness category for various local economic or "community stability" reasons. Records for these decisions indicate that specific types of development such as intensive logging or site intensive recreational development were contemplated for each of these areas. Further, as the environmental statement explains, if an area had proven resources, it was normally designated for nonwilderness. It would seem obvious that the type of resources present would dictate the type of use anticipated.

Moreover, if nonwilderness use and its effect upon wilderness was unknown and could not be anticipated, then the actual designation decision was made in a factual and analytical vacuum. As I explained, the Forest Service has the discretion to choose any method of examining environmental values provided that method complies with NEPA. The method of analysis chosen, however, did not result in compliance with the statutory requirements for the very reason that it did not examine the environmental impact of the decisions which were made.

a single location, but were scattered across the United States. I doubt whether the widely dispersed records were "reasonably available for inspection."

. I do not find it necessary to reach this issue, however, because even assuming arguendo that the WARS worksheets are part of the EIS, they do not supply the type of site specific analysis required by NEPA.

Each worksheet is composed of separate rating forms for each attribute rated. Each rating form includes check boxes to indicate the present existence of types of man-made structures or facilities in each area (e. g. roads, fences, reservoirs) and rating boxes for the effect of such structures on the attribute being scored. Additional rating boxes were provided for broad, generic qualities of landform, topography and the like, and their effect on the attribute being scored. A brief space is provided for comments.[22] I have examined the completed worksheets for the areas in dispute. Few specific or unique characteristics of any area are even noted. The reader of these worksheets is not left with any concrete description of any area.

The WARS worksheets do not comprehensively describe the environment of the affected areas. WARS is a selective, nondescriptive scoring system that does not consider an area's inherent wilderness values, only its comparative score on generalized attributes. Little in the way of specific information is included: neither the flora and fauna nor the distinctive characteristics of a particular area are examined or even identified. No mitigation measures are considered that would reduce the impact of development on wilderness values. Most importantly, the WARS system utterly fails to consider the impact of nonwilderness designation on the wilderness attributes it purportedly rates.

The environmental statement never explains the justification for its comparative evaluation of wilderness attributes, a failure all the more serious because economic and resource values were not competitively rated but given absolute values with a result that an area with low WARS scores was placed in nonwilderness regardless of its economic or resource values, while an area with very high WARS scores might still be placed in nonwilderness if the area had potential resources.[23] Thus the WARS ratings introduce an unexplained and thus unjustified bias that preselected against wilderness: areas with comparatively "low" scores were automatically placed in nonwilderness. The result is amply demonstrated by the areas in dispute in this lawsuit: the majority of the areas either had very high WARS scores or development ratings that indicate that the cost of development exceeds the anticipated return in resources. Nevertheless they were all designated nonwilderness.

While this approach appears to contravene NEPA because the justification for the bias is not articulated, it also appears to undercut the policies enunciated in the Wilderness Act, 16 U.S.C. 1131 et seq. The Wilderness Act does not speak in terms of comparative ratings, but in terms of intrinsic wilderness values. As noted, all RARE II areas meet the minimum criteria of the Wilderness Act. The result is that WARS deprives Congress of the information it must have to make its determination as to what areas should be included in the Wilderness System.[24]

---

**22.** The comments are of a brief, and very general nature. For example, one comment under the "opportunity for solitude" attribute merely stated "good topographical variation." The type of land features or vegetation present in this area is undisclosed. Major features of an area are reduced to highly generalized descriptions such as "mountain" or "river". One can hypothesize how the Grand Canyon might be rated: "Canyon with river, little vegetation."

**23.** In addition, the WARS ratings utterly fail to take into account the size of an area. Thus a small area with a slightly higher WARS rating than a much larger area is more likely to be designated for wilderness.

**24.** The Court can take judicial notice that there is sentiment in Congress to expand the number of areas designated for wilderness to include areas rejected by RARE II. Neither the proponents or the opponents of these proposals can turn to RARE II's environmental statement for

■ NEPA requires an agency to insure that "presently unquantified environmental amenities and values . . . be given appropriate consideration in decisionmaking along with economic and technical considerations." 42 U.S.C. 4332(B). While formal cost-benefit analysis is not required, *Trout Unlimited v. Morton* (9th Cir. 1974) 509 F.2d 1276, 1286, the agency must nevertheless give full consideration to environmental factors. *Calvert Cliffs Coordinating Comm. v. Atomic Energy Comm.*, supra; *Libby Rod & Gun Club v. Poteat* (D.Mont.1978) 457 F.Supp. 1177, 1189 reversed in part on other grounds 594 F.2d 742 (9th Cir. 1979). The RARE II statement makes no attempt to balance economic and wilderness values. As I noted, the economic values of wilderness are not considered. The WARS ratings offer no intrinsic values to balance against the heavily quantified economic factors discussed in the environmental statement.[25] The negative environmental impact of development is never balanced on the scales along with the purported economic benefits of development.

In sum, even if all the material referred to is incorporated into the final statement, it still fails to demonstrate that the Forest Service took a "hard look" at each area's intrinsic values or provided full disclosure on the effects of its proposed action. The Forest Service's justification for the failure to provide detailed site specific examination of the areas in question is bottomed on the notion that compliance with its statutory NEPA duties would render the environmental statement too "bulky." A statutory duty cannot be excused simply because it is difficult to perform. Moreover, the "bulky" result is not the product of some intrinsic difficulty, but of the Forest Service's determination of the scope of the project and its environmental statement.

While the scope of the project is committed to the sound discretion of the agency, if its choice of scope results in an inability to comply with its statutory mandate, that exercise of discretion must be condemned as "unsound."

### C. Consideration of Alternatives

Plaintiffs argue that the RARE II EIS failed to consider a reasonable "intermediate" wilderness alternative and limited its discussion of alternatives to an arbitrarily restricted and biased range of alternatives. The final statement considered eleven alternatives. Aside from one alternative that allocated all RARE II areas to wilderness, no other alternative allocated more than 34% of the total areas to wilderness despite the fact that all areas met minimum criteria for wilderness designation. By contrast, aside from the all wilderness and all nonwilderness alternatives, the remaining alternatives designated from 37 to 94% of the areas to nonwilderness.

### 1. Standard to be Applied

NEPA requires a "detailed statement . . . on . . . alternatives to the proposed action . . . ." 42 U.S.C. 4332(C). In addition, agencies are commanded to "[s]tudy, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. 4332(E).

■ The duty to discuss alternatives has been described as the "lynch pin" of the entire impact statement. *Natural Resources Defense Council v. Callaway* (2d Cir. 1975) 524 F.2d 79, 92, quoting *Monroe County Conservation Society, Inc. v. Volpe* (2d Cir. 1972) 472 F.2d 693, 697–8. An in-depth discussion of a reasonable range of

---

meaningful site specific information as to the intrinsic wilderness characteristics of areas excluded from RARE II wilderness designations. This result is perhaps the clearest demonstration of the inadequacy of the RARE II EIS under NEPA.

**25.** The environmental statement explains that because of "the inability to properly value wilderness benefits, the decision process has relied

. heavily upon an 'opportunity cost' approach . . . that seeks to minimize adverse impacts such as employment losses and community disruption. . . . Since a 'holistic' approach is not used in economic analysis . . . present net worth value [does] not recognize non-commodity benefits of wilderness." (FES W1–2).

alternatives insures that the decisionmaker, as well as the public, has before it all reasonable approaches to a project. "Only in that fashion is it likely the most intelligent, optimally beneficial decision will ultimately be made." *Calvert Cliffs Coordinating Comm. v. Atomic Energy Comm.* (D.C.Cir. 1971) 146 U.S.App.D.C. 33, 38, 449 F.2d 1109, 1114. See also *NRDC v. Morton* (D.C. Cir.1972) 148 U.S.App.D.C. 5, 13, 458 F.2d 827, 835.

▆▆▆ The agency need not "ferret out every possible alternative, regardless of how uncommon or unknown." *Vermont Yankee Nuclear Power Corp. v. NRDC* (1978) 435 U.S. 519, 551, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460. But if the agency need not consider every conceivable alternative, neither may it ignore obvious ones. At the very least, the range of alternatives should be sufficient to permit a reasoned choice. *Brooks v. Coleman* (9th Cir. 1975) 518 F.2d 17, 19.

▆▆▆ This "rule of reason" approach applies both to the range of alternatives discussed as well as the extent each alternative must be discussed. *State of Alaska v. Andrus* (D.C.Cir.1978) 188 U.S.App.D.C. 202, 212, 580 F.2d 465, 475 vacated in part on other grounds 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315; *Life of the Land v. Brinegar* (9th Cir. 1973) 485 F.2d 460, 472, cert. den. 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312. The applicable Council of Environmental Quality regulations require a "rigorous exploration and objective evaluation of the environmental impacts of all reasonable alternative actions . . . . In each case, the analysis should be sufficiently detailed to reveal the agency's comparative evaluation of the environmental benefits, costs, and risks of the proposed action and each reasonable alternative." 40 C.F.R. 1500.-8(a)(4).

▆▆▆ The reasonableness of the range of alternatives and the required depth of discussion of alternatives is a mixed fact and law question. Initially, plaintiff bears the burden of demonstrating that reasonable alternatives were not discussed in the environmental statement. *Life of the Land v. Brinegar, supra* at 471. Once this initial burden is met, however, defendants must justify the environmental statement's failure to discuss the allegedly reasonable alternative. Normally, such justification is limited to the four corners of the environmental statement itself, since it is the administrative record for purposes of review. *See e. g. Jicarilla Apache Tribe v. Morton* (9th Cir. 1973) 471 F.2d 1275, 1286; *NRDC v. Morton* (D.C.Cir.1972) 148 U.S.App.D.C. 5, 14, 458 F.2d 827, 836; *American Timber Co. v. Berglund* (D.Mont.1979) 473 F.Supp. 310, 314; *National Wildlife Federation v. Andrus* (D.D.C.1977) 440 F.Supp. 1245, 1254. If the environmental statement fails to explain the basis for its range of alternatives, or why other reasonable alternatives were not considered, then it fails to meet the mandates of NEPA. In the absence of an explanation in the EIS of the criteria employed in the selection of alternatives, Congress, other officials, and the public will never have a way of "checking on the validity" of its conclusions. *Chelsea Neighborhood Association v. Postal Service* (2d Cir. 1975) 516 F.2d 378, 389.

▆▆▆ A failure to discuss a reasonable range of alternatives or to reveal the criteria employed for selection of reasonable alternatives in the statement suggests that either the agency has not taken a "hard look" at the environmental factors involved and has thus acted arbitrarily, or that the agency simply has not revealed its process of decisionmaking (*American Timber Co. v. Berglund, supra; National Wildlife Federation v. Andrus, supra*), and has thus failed to make full environmental disclosure.

▆▆▆ The duty to consider reasonable alternatives is independent from and of wider scope than the duty to file an environmental statement. *See* 42 U.S.C. 4332(E); *NRDC v. Callaway* (2d Cir. 1975) 524 F.2d 79, 93. One of the reasons I concluded that individual area designations are major federal actions requiring an impact statement is because the designations foreclose future consideration of the wilderness alternative.

### 2. Reasonable Range of Alternatives

As I explain, plaintiffs have met their burden of demonstrating that the Forest Service did not consider a reasonable range of alternatives. Nothing in either the draft or final EIS explains or justifies the limitation of the range of alternatives actually considered. Thus I must conclude that either the Forest Service acted arbitrarily in its restriction of the range of alternatives, or, it simply has not revealed the reasons behind its action. Under either conclusion, the statement is fatally deficient.

Plaintiffs essentially contend that the absence of an alternative that allocates more than 34% and less than all areas to wilderness violates the duty to consider a reasonable range of alternatives. By forcing a draconian choice between the extreme of all wilderness,[26] and ten other alternatives all heavily skewed to nonwilderness, the Forest Service denied itself, as well as Congress and the public, the opportunity to explore the feasibility of an "intermediate" wilderness alternative.

The consideration of the all wilderness alternative does not, as defendants argue, fulfill the Forest Service's duty to consider a broad range of alternatives. First, as plaintiffs argue, there is the undeniable fact that no alternative allocating from 34 to 100% of the areas to wilderness is discussed. Once a reasonable range of alternatives is established, it is normally within the agency's discretion to select alternatives for examination within that range. (*Vermont Yankee Nuclear Power Corp. v. NRDC* (1978) 435 U.S. 519, 551–2, 98 S.Ct. 1197, 55 L.Ed.2d 460; *Brooks v. Coleman* (9th Cir. 1975) 518 F.2d 17, 19.) The agency nevertheless must exercise its discretion, it cannot simply ignore a broad range by selecting alternatives heavily skewed to one result.

Defendants argue that since they cannot consider every possible alternative, the choice of exact percentages of allocations is ultimately arbitrary. In a *reductio ad absurdum* argument, they ask how many alternatives they must discuss: ten? one hundred? Their argument misses the mark.[27] It is defendants' duty to consider all reasonable alternatives. Thus plaintiffs need not demonstrate either the precise alternative percentage allocations that must be examined or the number of alternatives that must be discussed in order to prevail. They meet their burden by demonstrating that the agency, without explanation, did not consider any alternative within the range of 34 to 100% wilderness allocations. While an agency is not required to consider "minor variations" of alternatives already discussed in the statement, *Brooks v. Coleman, supra*, it is clear that failure to discuss any alternative within a range spanning 65% of the possible allocations is not merely a failure to consider a minor variation of alternatives already discussed.

---

**26.** Nothing in the record indicates that the all wilderness alternative was inherently unreasonable; indeed, since all areas met the minimum statutory criteria for wilderness classification, it would appear to be an obvious alternative. Nevertheless, the environmental statement makes it clear that the Forest Service did not consider it to be a realistic alternative. The statement explains that consideration of the all wilderness alternative "needs no explanation . . . yet [it] serves a useful purpose as a reference point . . ." (FES 26). Although the precise reason that the all wilderness alternative "needs no explanation" escapes the Court, the phrase at least suggests that it was included because it was within the range of reasonable alternatives. On the other hand, the EIS treated it as an extreme choice which would result in significantly more resource shortfalls than any other alternative, although how this was determined without considering alternative resources is unknown (See infra). The emphasis on resource exploitation that pervades the environmental statement made its rejection inevitable.

**27.** Moreover, as I explain, no rationale is given in the EIS for the range of alternatives examined. Indeed, in the absence of explicable criteria for the selection of the range actually examined, the burden of the *reductio ad absurdum* argument must be borne by defendants. If an alternative allocating 34% of the areas to wilderness is reasonable, why not one of 35% or 36%? The problem is really a subtle expression of classical logic: that which can be freely asserted (i. e. without logical or evidentiary support) may be freely denied.

Secondly, under the circumstances of this case, the Forest Service had a special duty to consider a broad range of alternatives. Since the RARE II program is a far reaching project with both programmatic and site specific consequences, the Forest Service was required to consider a wider range of alternatives than in a narrower program. *See,* e. g. *NRDC v. Morton* (D.C.Cir.1972) 148 U.S.App.D.C. 513, 458 F.2d 827, 835. As I explained, the RARE II program contemplates two distinct actions: legislative proposals for additions to the wilderness system, and administrative actions opening areas to development. Since the two actions have inconsistent, and indeed opposite purposes and results, the duty to consider alternatives is heightened. *See* 42 U.S.C. 4332(E).

Moreover, the fact that specific legislative proposals are contemplated also suggests that a broader than normal range of alternatives must be addressed. First, since Congress reserved to itself the power to add areas to the Wilderness System, and all RARE II areas meet the minimal criteria for such inclusion, it is especially important that Congress have before it a full range of possibilities, with an in-depth discussion of the consequences of each alternative. Second, since Congress, unlike an administrative agency, is not bound by existing law or regulation, reasonable alternatives that contemplate changes in regulation or law must be disclosed to it.[28]

Despite this duty to consider an especially broad range of alternatives, the Forest Service failed to consider any alternative within a range of 65% of the possible allocations. Despite a careful reading of the final statement, I can discern no reason or factual

basis for this restriction in the range of alternatives. As I explained, the statement itself must justify its range of alternatives; it must explain the basis for its conclusion that its range of alternatives is reasonable. This the RARE II EIS simply does not do. The statement mentions five criteria utilized in developing alternatives. A critical examination of these criteria demonstrates that they in no way explain or justify the restricted range of alternatives discussed in the environmental statement. I now undertake such an examination.

The first criterion is based upon resource output levels assigned to each area by the Forest Service.[29] No explanation of how these levels were determined appears in the statement. Indeed, the Forest Service admits that the levels "may appear to have been arbitrarily selected but, in fact, represent a realistic establishment of acceptable resource tradeoffs to provide various alternative approaches." (FES 21). Whether or not the tradeoffs were "acceptable" or "realistic," what is critical for determining the sufficiency of the EIS is that we cannot determine from it what the actual tradeoffs were or why they were considered acceptable or realistic. Whatever the tradeoffs were and however realistic, the resource output levels established by the Forest Service do not in any way explain or justify the restricted range of alternatives for several reasons. First, the Forest Service itself did not feel bound by them when it developed its alternatives. Many of the considered alternatives failed to meet the level of various resource outputs designated by the Forest Service. Second, nothing in the statement discloses

---

**28.** I do not mean to imply that an agency should not consider alternative agency actions that contemplate changes in policy, regulation, or law. *See,* e. g. *NRDC v. Morton* (D.D.C. 1974) 388 F.Supp. 829, 836–37, aff'd without opinion 174 U.S.App.D.C. 77, 527 F.2d 1386, cert. den. 427 U.S. 913, 96 S.Ct. 3201. I merely observe that since Congress has a wider latitude in its decision making power, it is particularly important that it have before it an especially broad range of alternatives.

**29.** The Forest Service has set broad program goals for resources including timber, wilderness, recreation, etc. Apparently, the Forest Service assigned a portion of these goals to the RARE II areas. The method of determining what portion of these goals should be assigned to the RARE II areas is not disclosed in the statement. These goals will be updated in 1980, in part with data derived from RARE II. It should also be noted that these goals were established prior to the passage of the National Forest Management Act, 16 U.S.C. 1604, and may therefore be outmoded.

whether and to what extent an alternative that assigned between 34 and 100% of the areas to wilderness meets the assigned levels. Third, the statement never discusses whether or not these goals could be met utilizing areas other than the RARE II areas. Fourth, under appropriate circumstances, an agency may still be bound to consider reasonable alternatives that only partly meet the goals of a project. *NRDC v. Morton, supra* at 836–37. Finally, Congress is certainly not bound by the levels, and in considering areas for wilderness inclusion it may well decide to disregard them.

The second criterion the Forest Service asserts it used to develop alternatives was guidelines derived from the Multiple Use and Sustained-Yield Act, 16 U.S.C. 528 et seq., and the Wilderness Act, 16 U.S.C. 1131, et seq. Nothing in these statutes require a restriction in the range of alternatives. Indeed, both statutes indicate that a broad range is required. The Multiple Use statute specifically states that the establishment of wilderness areas is consistent with multiple use and the sustained-yield goals, 16 U.S.C. 529. Nothing in this statute limits the Forest Service's discretion in considering alternatives, cf. *Perkins v. Bergland* (9th Cir. 1979) 608 F.2d 803. The Wilderness Act, of course, is designed to protect wilderness. Since all areas meet the minimum criteria of the Wilderness Act, all areas, it would seem, should be considered for inclusion in the Wilderness System. Accordingly, some lesser percentage of wilderness allocations would also appear appropriate.

The third criterion purportedly utilized in developing alternatives was composed of factors identified by the public concerning the accessibility, distribution, landform, wildlife and ecosystems that should be considered in determining whether to add areas to the Wilderness System. Nothing in these criteria suggest a reason to restrict

the range of alternatives. Significantly, only the all wilderness alternative fully meets all of these criteria, which again suggests that an intermediate wilderness alternative would better meet these goals than the alternatives that do not allocate more than 34% of the areas to wilderness.

The fourth criterion purportedly considered dealt with the impact of allocations on resource exploitation such as timber cutting, intensive recreation, etc. Nothing in this criterion indicates why the range of alternatives was restricted. Indeed, since the environmental statement never considered the necessity of exploiting the RARE II resources (i. e. whether these resource needs could be met by exploiting other, non-RARE II areas), there is no way to evaluate the reasonableness of the alternatives arrived at by utilizing this criterion. Finally, at least as to timber, all alternatives except all wilderness, meet the Forest Service's own goals,[30] which suggests at least the probability that an intermediate wilderness alternative might meet them also.

The final criterion identified by the Forest Service is the score given each area by the Wilderness Attribute Rating System. Nothing in these scores suggests a reason for restricting the range of alternatives. Further, since the Wilderness Act from which the rating system was purportedly derived speaks in terms of absolute wilderness values, a competitive system devised by the Forest Service is an inappropriate means to limit the range of alternatives. It is Congress' decision, not the Forest Service's, as to what areas should be included in the Wilderness System.

Thus nothing in the environmental statement explains or otherwise justifies the restricted range of alternatives considered. I can only conclude that there was either no justification and thus the restriction was arbitrary, or the Forest Service had reasons

---

**30.** The draft statement states that all alternatives except the wilderness alternative meet the timber goals set for the year 2015, the same target date utilized for the other Forest Service Resource Goals. Without explanation, the final statement utilized a 1985 timber goal, but continued to utilize the 2015 goals for other resources. Only two of the eleven alternatives considered meet the 1985 goal.

and simply did not disclose them. The Court need not decide whether different alternatives would fulfill the Forest Service's criteria; it is enough to determine that the relationship between the criteria and the resulting range of alternatives cannot be ascertained from the EIS.

Defendants argue that no fixed percentages for allocations to wilderness or nonwilderness were assigned to alternatives; the alternatives were merely various combinations of decisional criteria. It was only after the criteria were applied to the RARE II areas that it became clear what the percentage allocations would be. The import of this argument is unclear. If defendants are suggesting they lacked intent to create a biased range of alternatives, then the argument is irrelevant. Lack of intent is simply not a justification for an unreasonably restricted range of alternatives. On the contrary, what such an assertion suggests is that the Forest Service never considered deliberately and in depth, the range of alternatives that should be considered or the impact of its actual allocations.

On the other hand, defendants may be arguing that the alternatives it must explore are not the ultimate results, i. e. the actual allocations, but rather the different mixes of decisional criteria. This argument ignores several facts. First, and most obviously, it does not explain why different mixes of criteria that would lead to an intermediate wilderness alternative are not reasonable.[31]

Second, this argument ignores the fact that the major federal actions contemplated by RARE II are the allocations themselves. Defendants are thus arguing that the reasonable alternatives the Forest Service must consider do not include alternatives to the actual action contemplated. No matter how the alternatives are constructed, the alternatives that must be considered are ultimately alternative *results*. While of course the analytical method leading to allocations under each alternative is an integral part of that alternative, the environmental statement does not demonstrate, or even suggest, that it would be unreasonable to construct an alternative that resulted in allocations to wilderness of between 34 and 100% of the areas.

### 3. *Reasonable Alternatives*

I have concluded that the Forest Service failed to exercise its discretion by not examining any alternative that allocated between 34 and 100% of the areas to wilderness. Because of this failure, Congress, the public, and other officials will have no way of "checking on the validity" of its conclusions. *Chelsea Neighborhood Ass'n v. Postal Service, supra* at 389. In addition to restricting the range of alternatives and focusing on alternatives mainly skewed towards development, the Forest Service failed to discuss two specific types of alternatives that appear to be not only reasonable, but "obvious." Cf. *Brooks v. Coleman, supra* at 19.

First, although the statement considers programmatic alternatives for the overall allocations, it never considered alternatives for specific areas other than the broad wilderness, nonwilderness, and further planning classifications. Alternatives other than these extreme choices offer a potentially better resolution of the tension between resource goals and wilderness goals. Thus the statement never considers alternatives such as limited or conditioned development, geographical use restrictions, or mitigation measures to reduce the impact of development activities on wilderness values. If the RARE II EIS were truly a programmatic statement—that is it only established general criteria without irrevocably designating specific areas—these considerations would not necessarily be appropriate. As I have explained, however, the RARE II program makes site specific decisions which

---

31. Many of the decisional criteria utilized arbitrary cutoffs. For example, in one alternative, any area scoring lower than the fortieth percentile in WARS ratings was automatically designated to nonwilderness. There is no reason this Court can discern why a different cutoff that would result in more wilderness allocations could not have been employed; however, again, if there was a reason it was not articulated in the EIS.

preclude future consideration of wilderness. Under these circumstances, a site specific discussion of alternatives is required. *See* e. g. *Kelley v. Butz* (W.D.Mich.1975) 404 F.Supp. 925, 935; *NRDC v. Morton* (D.D.C. 1974) 388 F.Supp. 829, 838–9, aff'd without opinion 174 U.S.App.D.C. 77, 527. F.2d 1386 cert. den. 427 U.S. 913, 96 S.Ct. 3201, 49 L.Ed.2d 1204.

Second, although it is clear that the purpose of nonwilderness designation is to open areas to resource exploitation, the environmental statement nowhere considers the obvious alternative of increasing the production of resources in other areas that are already being developed, thus avoiding the draconian decision between wilderness and development.[32] The environmental statement does not disclose any reason for not considering this alternative. In short, the statement never evaluated or justified the necessity for developing the RARE II areas at all. *See* e. g. *Libby Rod & Gun Club v. Poteat* (D.Mont.1978) 457 F.Supp. 1177, 1187, reversed in part on other grounds 594 F.2d 742 (9th Cir. 1979). Indeed, the statement discloses that the cost of developing over half of the areas designated for nonwilderness *exceeds* the value of resources that would be gained from development. The same is true of fourteen of the areas in dispute in this lawsuit.

### D. *Conclusion*

■ The methodological inadequacies of the RARE II EIS are not mere legal nitpicking, but go to the heart of the NEPA process. Courts do not sit to judge whether or not the agency's ultimate decision is "correct." The court's role in the NEPA process is to insure that NEPA procedures are followed and thus that the agency took a "hard look" at environmental factors and disclosed these factors to Congress, other officials, and the public. Only if an environmental statement fully assesses the environmental risks and costs of proceeding can the public be assured that decisionmaking is considered and not blind.

Congress placed great importance in curtailing ill-considered decisionmaking when it adopted NEPA. As the Senate Committee that reported the bill which eventually became NEPA explained:

> The challenge of environmental management is, in essence, a challenge of modern man to himself. The principal threats to the environment and the Nation's life support system are those that man has himself induced in the pursuit of material wealth, greater productivity, and other important values. These threats—whether in the form of pollution, crowding, ugliness, or in some other form—were not achieved intentionally. They were the spinoff, the fallout, and the unanticipated consequences which resulted from the pursuit of narrower, more immediate goals.

S.Rep.No.91–296 (91st Cong. 1st Sess.) at 8–9

### V

## THE FOREST SERVICE FAILED TO PROVIDE AN OPPORTUNITY FOR MEANINGFUL COMMENT AND FAILED TO ADEQUATELY RESPOND TO COMMENTS

Plaintiffs raise three objections to the RARE II comment procedures. First, since the proposed action was not disclosed in the draft EIS, the public was denied an opportunity to consider and respond to it. Second, the Forest Service did not respond to comments directed to individual areas. Finally, the Forest Service changed its method of evaluating comments after the draft EIS.

### A. *General Standards*

■ NEPA and the Council of Environmental Quality implementing regulations contemplate a reasonable opportunity for public and official comment on the im-

---

**32.** For example, evidence introduced by Defendant National Forest Products Assn., et al, indicates that existing public and private commercial timber areas are operating at only fifty percent of capacity. Defendants have not explained why increasing production on these sites is an unreasonable alternative.

pact statement.[33] *Lathan v. Volpe* (W.D. Wash.1972) 350 F.Supp. 262, 266; cf. *Jicarilla Apache Tribe of Indians v. Morton* (9th Cir. 1973) 471 F.2d 1275; *NRDC v. Morton* (D.D.C.1974) 388 F.Supp. 829, 839, aff'd without opinion 527 F.2d 1386 cert. den. 427 U.S. 913, 96 S.Ct. 3201, 49 L.Ed.2d 1204. Reasonable and relevant comments on the draft EIS must be responded to in the final EIS. *Lathan v. Volpe, supra* at 265; *Appalachian Mountain Club v. Brinegar* (D.N.H. 1975) 394 F.Supp. 105, 118.

While the agency is not required to follow or adopt the comments, the "relevant questions under NEPA are whether such comments are made available to decisionmakers, whether . . . they receive good faith attention from decisionmakers. [citation omitted] The purpose of an EIS is to disclose such issues . . . ." *Warm Springs Dam Task Force v. Gribble* (9th Cir. 1977) 565 F.2d 549, 554. For this reason, the final agency decision should be made *after* the draft has been circulated, considered, and discussed. *NRDC v, Callaway* (2d Cir. 1975) 524 F.2d 79, 91–92.

### B. *Comments on Proposed Action*

Plaintiffs argue that the proposed action was not disclosed in the draft EIS. The final EIS for the first time identified the Forest Service's proposed action; it was not one of the alternatives listed in the draft, but purported to be a combination of two alternatives in the draft. The final

EIS was not distributed to the public, and in any case the Forest Service did not respond to official comments on the final EIS. Thus, unless the proposed action was clearly articulated in the draft statement, the public was denied an opportunity to consider and comment upon the proposed action, and the Forest Service denied itself the benefit of the public's comment.

It is clear that the proposed action was a new alternative not previously disclosed in the draft. Initially, two of the draft alternatives were combined[34] to provide an "analysis base". A complex ten step decisional process, including four steps that involved the personal, subjective judgment of Forest Service officials, was applied to the analysis base to determine the ultimate allocations. Perforce, the allocations (i. e. the final result) under the proposed action are quite different from the two combined alternatives and from any other alternatives in the draft.[35]

Defendants raise several arguments in an attempt to justify not disclosing the proposed action in the draft EIS. First, they argue that not specifying a proposed action in the draft encouraged robust discussion and allowed the agency the flexibility to change its plans if shortcomings were identified. Further, they point out that the Forest Service simply had not decided upon a course of action at the draft stage. Finally, they rely upon the Council of Environmental Quality regulations that did not require

---

**33.** NEPA requires copies of the EIS and comments of appropriate agencies to accompany the proposal through the review process. 42 U.S.C. 4332(C). Council of Environmental Quality regulations require circulation of the draft EIS to the public, consideration of responsible comments, and attachment of such comments to the final EIS. 40 C.F.R. §§ 1500.9, 1500.10.

**34.** The two alternatives were alternative C, described as "resource/commodity oriented" (FES 27) and alternative I, which is described as "more wilderness oriented" (FES 31). The analysis base included those wilderness and nonwilderness designations that were common to both alternatives. All other areas (e. g. where the two alternatives proposed conflicting designations) were placed in the further planning category.

**35.** The proposed action designated 21% of the areas to wilderness and 68% to nonwilderness, resulting in total RARE II acre designations of 23% wilderness and 59% nonwilderness. Alternative C designated 26% of the areas to wilderness and 68% nonwilderness for acreage allocations of 14% wilderness and 68% nonwilderness. Alternative I allocated 36% of the areas to wilderness and 37% nonwilderness for acreage allocations of 33% wilderness and 37% nonwilderness. All other allocations were to the further planning category. The overall percentage allocations for each alternative, of course, were composed of different combinations of specific areas. Thus one area might be allocated to further planning by the proposed action, to wilderness by Alternative I, and to nonwilderness by Alternative C.

the proposal to be identified in the draft. 40 C.F.R. 1500.7(a).

Defendants' rationale may well justify the Forest Service's initial failure to identify the proposed action in the draft statement. It does not, however, justify the failure to provide any opportunity to the public to comment on the proposed action once that action was in fact decided upon. Although Council of Environmental Quality regulations do not require identification of the proposed action in the draft statement, they do require circulation for comment "prior to the first significant point of decision in the agency review process." 40 C.F.R. 1500.7(a).[36]

The appropriate course of conduct in these circumstances would have been to circulate a supplement to the draft EIS when a proposed action had been identified. The new Council of Environmental Quality regulations require such a supplement if the agency "makes substantial changes in the proposed action. . . ." 40 C.F.R. 1502.9(c)(i) (1978). Although the old regulations did not provide for supplements, case law predating RARE II clearly authorized, and in some cases required, circulation of supplements under similar circumstances. See, e. g. *NRDC v. Callaway* (2d Cir. 1975) 524 F.2d 79, 91–92. Whether well motivated or not, the procedure adopted simply precluded comment on the actual decision the Forest Service reached.

Defendants argue, however, that the Forest Service did consider and respond to comments. The decisional criteria utilized in the proposed action were disclosed in the draft, and the Forest Service responded to comments on these criteria by formulating the proposed action. There are several problems with this argument. First, and most obviously, as noted above, the public simply never got a chance to comment on the actual allocations. Second, although the public was able to comment upon general decisional criteria, it never was able to comment on the ultimate priorities given to these criteria, or on the actual subjective judgment exercised by Forest Service personnel pursuant to the final decisional process. Finally, public comment on the decisional criteria was in the context of broad policies enunciated in a decisional vacuum; thus the public was unable to relate the criteria to the concrete facts.

Although no case has confronted this precise problem, similar policies are implicated when important data is not included in a draft but is later included in a final EIS. The court in *Appalachian Mountain Club v. Brinegar, supra* at 121–122, in upholding plaintiff's challenge to this shortcoming, explained:

"There cannot be responsible decisionmaking when data appears in the final EIS without being subject to the critical evaluation [citation omitted] that occurs in the draft stage. There are two dangers that can occur when information appears in the final EIS for the first time: (1) the ultimate decisionmakers will believe that there is no controversy due to the lack of critical comment; and (2) objective errors without being redflagged would go unnoticed. . . ."

These factors are even more critical when the very action proposed is not subject to critical comment. This is especially important when the proposal, such as the RARE II decision, is likely to be controversial and of great impact. By not testing its proposal in the court of public comment, the Forest Service effectively undercut the twin goals of environmental statements: informed decisionmaking, and full disclosure.[37]

---

**36.** It seems reasonably clear that if the proposed action had been identified as merely an alternative but not as the proposed action in the draft statement, then recirculation or supplements identifying the proposed action would not have been necessary since the public would have had an opportunity to comment on the alternative.

**37.** Although defendants have not raised the argument, it can be suggested that the procedure adopted is more or less justified because RARE II is a programmatic, rather than site specific decision. As I have observed before, however, the program had enormous site specific consequences, and thus RARE II cannot be characterized as simply a programmatic decision. While it may be true that shifting to one of a

In the final analysis, the NEPA comment process is a procedural recognition that the land of the United States is held in trust for the citizens of this country, and that agency action may have a profound impact on this land as well as on non-federally owned land. NEPA thus provides a means by which the ultimate owners of the land—the citizens—may inform their trustees—the government—of their approval or disapproval of the proposed actions. The procedure adopted by the Forest Service deprived the public of that opportunity.

### C. *Response to Site Specific Comment*

The Forest Service invited comment on specific area designations in the draft EIS. The overwhelming majority of all comments received by the Forest Service following circulation of the draft statement were directed towards proposed allocations for specific areas.[38] The Forest Service did not respond to any of these site specific comments or even generally to the bulk of these comments. Instead, it tabulated the number of these comments, and listed the number of responses recommending either wilderness, nonwilderness, or further planning. The tabulations, although utilized as part of the decisional process, do not indicate the nature of the comment beyond a bald preference for designations.

Council of Environmental Quality regulations require all substantive comments (or summaries if exceptionally voluminous) to be attached to the final EIS even if the agency believes that the individual comments do not merit individual discussion in the text of the EIS. 40 C.F.R. 1500.10(a). "The proper response to comments which are both relevant and reasonable is to either conduct the research necessary to provide satisfactory answers, or to refer to those places in the impact statement which provide them. If the final impact statement

fails substantially to do so, it will not meet the minimal statutory requirements." *Lathan v. Volpe, supra* at 265.

Defendants do not contend that the site specific comments were not relevant or serious; instead, they argue that response by way of tabulation and the use of such tabulation in the decisional process was all that was necessary because it was infeasible to give individual consideration to the comments. As I have explained, however, designations for each area are major federal actions, requiring full NEPA compliance. Tabulation of bare designation preferences does not indicate that the agency has taken a "hard look" at the *environmental* problems raised. A preference for wilderness might, for example, be supported with site specific data indicating dangers of development or the unique features of an area. This type of comment was never responded to or, at least as far as the EIS discloses, ever considered. Cf. *NRDC v. Morton, supra* 388 F.Supp. at 839.

The difficulty of considering each comment is a factor the Forest Service should have considered before it decided to determine three thousand allocations at once. The volume of response may well have been a message to the Forest Service that the scope of the RARE II process was too broad. Since each area allocation was a major federal action, each area required individualized, site specific analysis. To deny such analysis based upon feasibility, especially when the problem of feasibility was the product of the Forest Service's own decision, violates the requirements of NEPA. Defendants' argument in effect suggests that an agency may always be excused from complying with the law when it chooses the device of broadening the scope of an action, or proposing a multitude of individual actions in one environmental

---

series of possible programmatic approaches after circulating a draft statement may not have the inherent deficiencies discussed above, where the final statement continues to involve site specific decisions, the public must be given an opportunity to comment.

**38.** The RARE II inventory was continually updated. After the draft EIS was circulated, many areas were added to the inventory. As to these areas, the public was denied any opportunity to comment. No claim is made in this action, however, that any of the areas disputed in this lawsuit were added to the inventory after the draft EIS was circulated.

statement, such that responding to the anticipated flood of comments is infeasible. As I have explained, the breadth of the action undertaken is committed to the sound discretion of the agency. When the exercise of that discretion, however, makes it impossible for the agency to comply with law, then courts must find that exercise of discretion unsound. To put it baldly, an agency has no discretion to make decisions, however well motivated, which preclude it from performing its legal duty.

### D. Change in Comment Evaluation

Plaintiffs next argue that the final statement violated the guidelines laid down for evaluation of comments in the draft statement. The draft provided that: In evaluating comments,

> "Emphasis will be placed on the *value of response content rather than on the number of signatures that support it.* While the information contained in petitions and forms may be as useful as that contained in a personal letter, multiple signatures on petitions or multiple copies of form letters will not make them more valuable than the personal letters in decisionmaking." (DES 107, italics added)

The final statement, in contrast, plaintiffs argue, simply counted the signatures and used the "vote counts" as part of its decisional process.[39] (Step one of the 10 step decisional process of the proposed action designates areas based upon a tally of signatures supporting the various designations.) Thus, instead of value content, the proposed action relies upon numbers of signatures. The vast majority of personal letters favored wilderness, and the majority of form letters favored nonwilderness. Five of the disputed areas were adjusted from wilderness or further planning designations to nonwilderness at step one based upon the "opinion poll."[40]

Although the EIS provided that area designations could be changed because of the Regional Forester's perception that public sentiment differed from the strict tabulations of signatures, none of these areas were reallocated to wilderness despite overwhelming personal letter support.

Defendants initially argue that there was no sharp contrast in the treatment of personal letters and forms as stated in the draft and the final EIS. This claim ignores the plain meaning of the language in the draft. The draft indicates that form letters, no matter how many signatures are on them, will not receive greater consideration than personal letters. Defendants suggest that "value content" was considered because each separate comment in personal letters and form letters was tabulated under different categories of comment. Despite this "content tabulation", however, a form letter with one hundred signatures was counted one hundred times while a personal letter signed by one person was only counted once.

Defendants argue that aside from the first step in the decisional process, other steps in the process considered personal letters. At step two, for example, the Regional Forester could change allocations if his view of public preference was different from what step one signature tabulations indicated. Accordingly, they argue consideration was given to how many responses were in the form of personal letters. The problem with this argument, however, is that the Regional Forester never had the actual letters and their "value content" before him; all he had was a computer printout showing the raw numbers of personal and form inputs. The proof of the argument is in the result: no areas in dispute were reallocated to wilderness at this step.

I assume that it would have been proper for the Forest Service to consider public response in the decisionmaking process in

---

**39.** Overall, 85,258 personal letters including 96,754 signatures commented on designations. By contrast, 76,831 petitions including 155,923 signatures, and 101,549 response forms including 105,913 signatures were sent to the Forest Service.

**40.** The Environmental Protection Agency, in its comments on the final environmental statement, noted that "[P]ublic response in personal letters was not given greater consideration than signatures on form letters, contrary to promises made in the draft EIS."

either manner, provided the method was disclosed in the draft. It is clear, however, that the Forest Service did not follow its own guidelines in the evaluation of comments. Although it is impossible to know precisely how this affected the ultimate resulting allocations, plaintiffs have demonstrated that at least as to five areas, it probably resulted in nonwilderness allocations. It is unknown how many other areas might have been allocated to wilderness if the Forest Service had followed its own guidelines.

It is clear, therefore, that the change in procedure may have prejudiced the case of wilderness, and certainly misled conservation oriented groups. Ultimately, at issue is a simple question of fairness.

Under the Administrative Procedure Act, 5 U.S.C. 706(2)(D), this court is required to "hold unlawful and set aside agency action . . . found to be without observance of procedure required by law." See also *Jicarilla Apache Tribe of Indians v. Morton, supra,* at 1280. It is well established that an agency is bound by its own rules, at least until such time as it changes them in accordance with requirements of due process and administrative procedure. See, e. g. *United States v. Nixon* (1974) 418 U.S. 683, 694–696, 94 S.Ct. 3090, 41 L.Ed.2d 1039; K. Davis, Administrative Law of the Seventies § 5.03–5 (1976 and Supp.1977).

 The fact that not everybody was misled by the draft statement is immaterial; it is clear that at least conservation groups were. No doubt, if they had been informed that only the number of signatures would be considered, they would have redirected their efforts towards getting signatures on forms instead of personal letters. Accordingly, I find that the Forest Service's change in the method of evaluating comments, without providing timely notice of the change, was without the observance of procedure required by law.

## VI

### THE RARE II NEPA VIOLATIONS REQUIRE INJUNCTIVE RELIEF

 Two types of injuries flow from RARE II's failure to comply with the mandate of NEPA. First, the Forest Service has authorized development that may destroy the wilderness character of areas without fully considering the wilderness values of these areas. Once development proceeds, by definition wilderness values are damaged and may be irreparably eradicated. Secondly, Congress will be denied the opportunity for reasoned consideration with site specific information of areas designated nonwilderness that may well qualify for wilderness designation.

Defendants nonetheless raise two types of arguments against injunctive relief. First, they argue that plaintiffs have not established the equitable prerequisites for injunctive relief. Although defendants earlier had argued that site specific analysis is presently unnecessary because development plans have not been made, they here argue that the balance of irreparable harm favors them because an injunction would halt immediate exploitation of needed resources. Second, defendant Webco Lumber Company argues that injunctive relief is barred by the National Forest Management Act, 16 U.S.C. 1604.

Normally, once a substantial NEPA violation has been shown, an injunction should issue without detailed consideration of traditional equity principles. *Warm Springs Dam Task Force v. Gribble* (9th Cir. 1977) 565 F.2d 549, 551; *Lathan v. Volpe* (9th Cir. 1971) 455 F.2d 1111, 1116; *Brooks v. Volpe* (W.D.Wash.1972) 350 F.Supp. 269, aff'd 487 F.2d 1344 (9th Cir. 1973).[41]

The rationale for this NEPA injunction rule is clear. NEPA represents a declared

---

**41.** The Court in *Lathan v. Volpe, supra,* explained that injunctive relief was required in cases where an environmental statement was not prepared, relying on the principle announced by the Supreme Court in *United States v. City and County of San Francisco* (1940) 310 U.S. 16, 30–31, 60 S.Ct. 749, 84 L.Ed. 1050, where the high court found that traditional equity principles did not apply where a court of equity was making "a declared policy of Congress effective." *Id.* at 1116.

Congressional policy requiring assessment of environmental concerns. As such, Congress has weighed the equities and determined that failure to examine environmental issues represents irreparable injury. See, e. g. *Wyoming Outdoor Coordinating Council v. Butz* (10th Cir. 1973) 484 F.2d 1244, 1250; *Environmental Defense Fund v. TVA* (6th Cir. 1972) 468 F.2d 1164, 1184. If, having established a violation of NEPA, plaintiffs are not allowed to enjoin further activities until the agency complies with NEPA, then NEPA would be an "exercise in futility". *Minnesota Pub. Int. Res. Group v. Butz* (8th Cir. 1974) 498 F.2d 1314, 1323. As one court explained in a non-NEPA context, timber company hardship cannot be considered because "the cutting of trees is . . . too final and conclusive. It must await the processes of law." *Parker v. United States* (D.Col.1970) 309 F.Supp. 593, 601, aff'd 448 F.2d 793 (10th Cir. 1971), cert. den. 405 U.S. 989, 92 S.Ct. 1252, 31 L.Ed.2d 455 (failure to comply with Wilderness Act).[42]

Defendants argue, however, that this rule has been overturned by the Supreme Court in *Kleppe v. Sierra Club, supra.* In that case, it is true, the Court observed that the Court of Appeals had made no findings on the equities. "Thus, in simple equitable terms there were no grounds for the injunction: The District Court's finding of irreparable injury to the intervenors and to the public still stood, and there were . . .

no counterveiling equities." Id. 427 U.S. at 407, 96 S.Ct. at 2729. The Supreme Court found, however, that since an impact statement was *not* required in that case, there was no irreparable injury to support an injunction. The Court noted that so long as an environmental statement is adequate, there is no reason for an injunction. Id. at 407, n. 16, 96 S.Ct. 2718.

The ambiguous language in *Kleppe* will not support defendants' position. First, as noted, since the Court found that an impact statement was not required, the case is distinguishable. Second, the Court's comment could just as well support the Ninth Circuit rule which presumes that a violation of NEPA establishes irreparable injury. Finally, contrary to defendants' assertion, the Ninth Circuit has adhered to its rule following the *Kleppe* decision. See *Warm Springs Dam Task Force v. Gribble, supra* at 551.[43]

Webco Lumber Company argues at length that even if the RARE II process violates NEPA, an injunction cannot issue to enjoin development in any area where such development is permitted by Forest Service management plans that were in effect on October 22, 1976, the effective date of the National Forest Management Act, 16 U.S.C. 1604. Webco relies upon § 1604(c) of that Act which provides that new plans in accordance with the Act must be implemented by 1985; "[u]ntil such time as a

---

**42.** I recognize that some courts continue to balance equities in NEPA cases, although even these courts appear to apply a presumption in favor of injunctive relief where a NEPA violation has been shown. See, e. g. *State of Alaska v. Andrus* (D.C.Cir.1978) 188 U.S.App.D.C. 202, 222, 580 F.2d 465, 485, vacated in part on other grounds, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315. The Ninth Circuit also appears to balance the equities when considering whether or not to issue an injunction pending appeal. See *Alpine Lakes Protection Society v. Schlapper* (9th Cir. 1975) 518 F.2d 1089, 1090; *Friends of the Earth v. Coleman* (9th Cir. 1975) 518 F.2d 323, 330. Even in these cases, however, the Ninth Circuit has held, absent unusual circumstances, that irreparable injury in a NEPA case may be "implied from the failure by responsible authorities to evaluate fully the environmental impact of the proposed project . . . ." *Friends of the Earth v. Coleman, supra* at 330.

See also *Cady v. Morton* (9th Cir. 1975) 527 F.2d 786, 798, n. 12. No unusual circumstances are alleged in the present case.

**43.** The irreparable injury defendants claim consists primarily in the loss of prospective profit they will suffer and the consequent adverse impact on the economy if they cannot immediately exploit the resources in the RARE II areas. Defendants' argument, however, is really that NEPA should never override economic considerations or, to put it even more bluntly, that where private prospective profits are threatened, the government need not obey the law. This claim is certainly not the type of "unusual circumstances" that might justify denial or limitation of injunctive relief. See e. g. *Cady v. Morton* (9th Cir. 1975) 527 F.2d 786, 798, n. 12.

unit of the National Forest System is managed under plans developed in accordance with this subchapter, *the management of such unit may continue under existing land and resource management plans."* (Emphasis added). Webco argues that this language validates any existing management plans whether or not they were promulgated in accordance with NEPA.

Webco does not indicate which, if any, areas have plans that authorize specific development activities.[44] The RARE II EIS indicates that nearly all RARE II areas do not have general management plans, and no areas have general plans in accordance with the new statute. Accordingly, even if the Court accepts Webco's position, nothing in the National Forest Management Act would prevent this court from requiring the Forest Service to consider wilderness values when it promulgates its new management plans.

Further, to the extent that any existing plan does not contemplate specific development activity, it is likewise clear that the language in the National Forest Management Act has no application to the injunction issue since, even under Webco's interpretation, validation of the plan does not result in validation of unspecified development activities. The only remaining question is the effect of the statute in areas that have existing plans that contemplate specific development activities.

Initially it should be noted that NEPA must be complied with to "the fullest extent possible" unless there is a "clear and unavoidable conflict in statutory authority." *Flint Ridge Dev. Co. v. Scenic Rivers Assn.* (1976) 426 U.S. 776, 788, 96 S.Ct. 2430, 2438, 49 L.Ed.2d 205; *Calvert Cliffs Coord. Comm. v. AEC* (D.C.Cir.1971) 146 U.S.App. D.C. 33, 39, 449 F.2d 1109, 1115. The legislative history of NEPA makes clear that agencies shall comply with NEPA unless

existing law "expressly prohibits or makes full compliance with one of the [NEPA] directives impossible . . . no agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance." Conference Report on NEPA, H.Rep.No.91–765 (91st Cong. 1st Sess.) at 9–10, U.S.Code Cong. & Admin. News 1969, pp. 2751, 2770.

Nothing in the National Forest Management Act expressly prohibits compliance or makes compliance with NEPA impossible. The Senate Report on the Act explains that new regulations under the Act should insure that land management plans are developed in accordance with NEPA. The Report specifically states that this section "does not alter the responsibilities of the Forest Service to comply with [NEPA] or the guidelines of the Council of Environmental Quality." S.Rep.No.94–893 (94th Cong. 2d Sess.) at 14, U.S.Code Cong. & Admin.News 1976, at p. 6673. Indeed, the only section in the Act that mentions NEPA states that new regulations promulgated under the Act shall "specify procedures to insure that land management plans are prepared in accordance with the National Environmental Policy Act. . . ." 16 U.S.C. 1604(g)(1). The Senate Report explains that this provision "is neither intended to enlarge nor diminish the Forest Service's responsibilities under the [NEPA] Act." S.Rep. at 34, U.S.Code Cong. & Admin.News 1976, p. 6693.[45]

From all of the above, it seems clear that Congress did not intend to change an agency's NEPA duties when it enacted the National Forest Management Act.

Thus the mere existence of an older forest plan will not excuse NEPA compliance. Obviously, however, if the older plan contemplates development, and is supported by the environmental analysis required by NEPA, then the failures of RARE II will

---

**44.** Webco introduced environmental statements for three management plans that appear to involve some of the disputed areas. None of these plans, however, authorize specific development activities; indeed, each state that additional environmental analysis will be required prior to specific development activities.

**45.** The Conference Report follows the Senate Report in stating that the Act "makes no change in the responsibilities of the Secretary [under NEPA]." S.Rep.No.94–1335 at 27, U.S. Code Cong. & Admin.News 1976, p. 6729.

not bar development. NEPA does not require an agency to plow the fields twice. If a development plan does not include analysis of the impact of a specific project that is a major federal action, however, it cannot be said to have even plowed the ground once.[46] Accordingly, I will not enjoin development that is authorized by an existing forest plan that is supported by environmental analysis in compliance with NEPA.

## VII

## CONCLUSION AND ORDER

Humankind has a deep and apparently abiding need for contact with nature. It may fairly be characterized as a profound spiritual longing that we ignore at our peril. It may arise from our need to be in contact with our roots, to replicate the history of the species, to test our ability to survive primitive conditions, and thus to stretch our ever more urbanized and accordingly constricted selves.

Such needs, as profound as they may be, must be balanced against equally pressing concerns: our need for the resources of the land, and for employment in general, particularly in the rural areas where much of the RARE II land is located. Lack of employment in those areas will inevitably lead to future disruption of rural life, and still greater urbanization with all of its serious environmental consequences for the nation.

The balancing of these concerns and the allocation of our limited resources to various compelling—but contradictory—goals are essentially political decisions. Courts, the least democratic of our political institutions, are ill equipped to strike the balances and determine the tradeoffs for society. Thus NEPA allocates ultimate decisionmaking authority to the other, more democratic branches, and limits the judicial role to insuring that its procedural requirements are fulfilled.

NEPA seeks through its procedural devices, however, to require the other branches to come to grips with these serious, and often conflicting environmental concerns. Because this lawsuit attacks the failure of the Forest Service to attend to its NEPA duties relative to wilderness values, this decision emphasizes those duties. That emphasis should not be misconstrued; it is the product of the nature of this lawsuit and NEPA itself. NEPA is designed to insure that the government closely examines the environmental effect of its programs and discloses to the ultimate owners of the land, the public itself, the factual and analytical basis of its decisions. In this case, the Forest Service failed to meet these goals.

Administrative agencies are products of the law—they have no legitimate power save that given to them by the law. When they fail to comply with the law, they simply act ultra vires—beyond their power. When an agency acts beyond the power given it by Congress, then the courts must perform their duty, which is to require the agency to comply with the law. That I now do.

Since I have found that the RARE II process did not comply with NEPA, I will enjoin any major federal action that may change the wilderness character of any of the areas in dispute that is not otherwise supported by an adequate environmental

---

**46.** Webco's reliance on *Texas Committee on National Resources v. Bergland* (5th Cir. 1978) 573 F.2d 201, cert. den. 439 U.S. 966, 99 S.Ct. 455, 58 L.Ed.2d 425 is misplaced. In that case, plaintiffs challenged the failure to prepare an environmental statement to support even-age timber cutting on Forest Service lands in Texas. An environmental statement had been prepared for the development of the area in dispute. Plaintiffs argued that this statement was deficient because it failed to assess the impact of even-age timber management. The Court found that no statement was required on this limited issue because Congress specifically intended that even-age cutting methods could continue under interim guidelines adopted pending the promulgation of the regulations required by the National Forest Management Act. Whatever the wisdom of the Court's holding, it is clear that it has no applicability to the present case. In *Texas Committee*, timber cutting in general was supported by a development plan in compliance with NEPA; only the specific method of cutting proposed did not require an environmental statement. *Texas Committee* certainly does not hold that all old forest plans are valid whether or not they comply with NEPA.

statement that assesses the impact of such action upon wilderness. Further, I will specifically enjoin the Forest Service from relying on RARE II nonwilderness designations and the RARE II environmental statement's consideration of the impact of nonwilderness designation on wilderness when it prepares plans in accordance with the National Forest Management Act for the areas in controversy in this action.

In assessing the wilderness values of these disputed areas prior to promulgating new plans or deciding upon major development actions that could change the wilderness character of any area, the Forest Service is free to devise any method of analysis that otherwise complies with law.

Ultimately, the injunction I issue simply requires the Forest Service to fully consider wilderness values prior to developing any specific RARE II area in dispute. I do not dictate what decision as to use or development the Forest Service must reach. That decision is committed to the Forest Service's discretion. What I do order is that the Forest Service must take the "hard look" it has thus far failed to take prior to acting on any area.

IT IS THEREFORE ORDERED THAT:

1. Plaintiffs' motions for summary judgment are granted.

2. The Court finds and declares that the RARE II nonwilderness designations were made in violation of the National Environmental Policy Act. The Court further finds and declares that the RARE II nonwilderness designations are legally insufficient to support any administrative action that changes the wilderness characteristics of any area in dispute in this action.

3. Defendants are enjoined from taking any action that may change the wilderness character of any area in dispute until and unless an environmental impact statement prepared and circulated in accordance with the National Environmental Policy Act has been filed which considers the impact of such action upon the wilderness characteristics of such area. This injunction does not prevent the Forest Service from proceeding

with development activities that it has previously analyzed in accordance with the National Environmental Policy Act aside from the analysis in the RARE II environmental statement.

4. Defendants are enjoined from relying on RARE II nonwilderness designations and the RARE II environmental statement's consideration of the impact of nonwilderness designations on the wilderness qualities of any area in dispute when they prepare plans pursuant to the National Forest Management Act. Defendants are specifically ordered to consider, evaluate, and assess wilderness values and possible wilderness classification under the Wilderness Act for each area in dispute prior to the promulgation of such plans.

5. Plaintiffs are awarded costs.